Fitzgerald v. Fitzgerald & Mallory Construction Co.

JOHN FITZGERALD, FOR HIMSELF AND ON BEHALF OF
    ALL OTHER STOCKHOLDERS OF THE FITZGERALD
    & MALLORY CONSTRUCTION COMPANY, APPELLANT,
    V. FITZGERALD & MALLORY CONSTRUCTION COM-
    PANY AND THE MISSOURI PACIFIC RAILROAD COM-
    PANY, APPELLEES.

FILED APRIL 4, 1895.    NO. 5309.

1. **Corporations:** LIABILITY FOR TORTS OF OFFICERS. The term
    "scope of authority," as used in the law defining the liability of
    corporations for the tortious acts of their officers and agents, is
    not susceptible of a precise definition, but is limited to acts in
    some way incident to the employment and duties of such agents
    and having some relation to the obvious purpose of their ap-
    pointment.

2. ———: ———: SALE OF BONDS: CONSTRUCTION COMPANY. A
    railroad company delivered to a construction company its bonds
    which had been earned by the latter in building certain lines
    of road. Afterward the directors of the construction company,
    a majority of whom were officers of the railroad company or
    controlled by it, voted to sell said bonds, then worth their face,
    to the stockholders of the construction company *pro rata*, ac-
    cording to the number of shares held by each, at a discount of
    ten per cent. The minority stockholders not being able to
    take and pay for the amounts thereof allowed to them, bonds
    were by a subsequent resolution disposed of at the same rate to
    the directors interested in the railroad company. No part of
    the proceeds thereof were returned to the last named com-
    pany nor did it profit in any way by the transaction. *Held,*
    In an action by the minority stockholders of the construction
    company against the railroad company for an accounting, that
    the action of the directors named in disposing of said bonds at
    a discount was not within the scope of their authority as offi-
    cers of the last named corporation and that said company is not
    liable for the loss thereby occasioned.

3. ———: ———: ———: ———. The fact that such bonds may
    have been withheld for a considerable time after they were
    earned by the construction company, to the damage of the latter
    in the loss of promised subsidies and prospective profits, although
    actionable in the proper proceeding, will not render the rail-

road company liable for loss by reason of the negligent or corrupt action of the directors of the last named company in disposing of said bonds for less than their value.

4. **Damages.** In all actions for damages the wrong done and the injury sustained must bear toward each other the relation of cause and effect, and the damages must be the natural and proximate consequence of the act complained of.

5. **Corporations:** Officers: Conspiracy: Ratification. *Held,* (1) From an examination of the evidence, that the loan to the construction company of $2,500,000 of the bonds of the railroad company by the president of the latter was a personal transaction in which said corporation was in nowise interested, and not made in pursuance of a conspiracy to which it was a party, having for its purpose the wrecking of a construction company; (2) that the last named company ratified said transaction by receiving and appropriating the bonds, and subsequently paying interest thereon with the knowledge and consent of all the stockholders.

6. **Contracts:** Pleading. The illegality of an agreement, unless disclosed by the pleadings or proofs of the party claiming through it, must, in order to be available to the adverse party, be specially pleaded.

7. **Public Policy:** Contracts. Agreement examined in the light of the evidence, and *held* not void as against public policy.

8. **Payment.** A debt will not be extinguished by the payment of a less sum than the amount actually due, unless based upon a new and sufficient consideration.

9. **Release and Discharge:** Consideration. The settlement of a doubtful or disputed claim is generally a sufficient consideration for a compromise; but in order to have such effect it is essential that there be in fact a dispute or doubt of the rights of the parties. An arbitrary refusal to pay, based on the mere pretense of the debtor, made for the obvious purpose of exacting terms which are inequitable and oppressive, is not such a dispute as will of itself support a compromise resulting in a reduction of the amount of his indebtedness

10. **Corporations:** Contracts by Directors Who are Members of Two Rival Companies: Validity. Persons who are directors of two corporations have no implied authority to bind either by contracts with respect to subjects in which their interests are adverse; and all such agreements, unless subsequently ratified, may be avoided at the suit of non-consenting stockholders.

11. **Equity**: RESCISSION: DURESS.  When money is paid or concessions exacted through necessity in order to obtain property illegally withheld, where its detention is accompanied by immediate hardship or irreparable injury, such transaction may be avoided on the ground of compulsion, although perhaps not amounting to a technical duress.

12. **Principal and Agent**: RATIFICATION.  Acquiescence by a principal in the fraudulent or unauthorized act of his agent is in effect a new agreement made with an intent to condone the wrong done, and will not be inferred from doubtful evidence, but should be established like any other material fact, by the party asserting it.

13. **Equity**: RESCISSION: LACHES.  Mere lapse of time, unaffected by other circumstances, will not bar the right to rescind a voidable transaction, since it is not for a wrong-doer to impose extreme vigilance or promptitude as conditions to the exercise of the rights of the injured party.

14. ———: ———: ———: EVIDENCE.  But the failure of the injured party to object after knowledge of the wrong is evidence of ratification, and may, especially when long continued, be sufficient of itself to warrant a finding for the party alleging such fact.

15. **Parties**: OBJECTIONS.  Objection on account of the absence of parties who are not indispensable to a determination of a controversy should be made by answer or demurrer, otherwise the court may determine the rights of the parties before it.

16. **Removal of Causes.**  The courts of this state will not examine an order of the circuit court of the United States remanding a cause for want of jurisdiction in order to determine whether such proceeding is in accordance with the practice of that court.  Such an inquiry should be made only in the court by which the order is made.

17. **Receivers**: GARNISHMENT.  It is no objection to the appointment of a receiver of a corporation, in an action by a stockholder for and accounting in its behalf against a corporation indebted to it, that the debtor corporation was summoned as garnishee of the first named corporation in an action against it by attachment, where the attachment proceeding has been abandoned and judgment entered for damage only, without any reference to the garnishee.

18. **Courts**: JURISDICTION.  It is a rule recognized alike by state and federal tribunals that the court which first acquires juris-

34

diction of the subject of an action will retain such jurisdiction until the final determination of the controversy.

19. **Amount of Decree.** *Fitzgerald v. Fitzgerald & Mallory Construction Co.*, 41 Neb., 374, so modified as to authorize a decree in favor of the plaintiff for $300,906.33.

REHEARING of case reported in 41 Neb., 374.

*Deweese & Hall* and *J. M. Woolworth*, for appellant.

*B. P. Waggener, John L. Webster* and *A. R. Talbot,* contra.

POST, J.

This cause was argued and submitted to us in the month of July, 1892; but leave to reargue was subsequently requested and allowed, and the cause assigned for hearing before the commissioners by whom were submitted the opinions heretofore filed. (See 41 Neb., 374–511.) A consideration of motions filed subsequent to the decision above mentioned having suggested a doubt of some of the propositions therein approved, a rehearing was ordered and the cause again submitted on its merits. It will be necessary on this hearing, for reasons which will hereafter appear, to notice but few of the many questions originally presented, and in the consideration of those our endeavor will be to apply well established principles of equity to the admitted facts of the case, rather than an analysis of the multitude of authorities cited in the numerous briefs and on the oral argument.

The result of our examination, it may be noted, is substantially in accordance with the views of the court as constituted at the time of the hearing first alluded to, although in justice to Mr. Commissioner RYAN it should be remarked that the different conclusion stated in the opinion mentioned was reached after consultation with the majority of the court and fairly reflects the views then entertained by us. It will

not be necessary at this time to state in detail the facts out of which this controversy arose, in view of the elaborate statements in the former opinions.

We will first notice the question presented by the claim of the plaintiff based upon the sale of the bonds of the Missouri Pacific Railway Company.  Briefly stated, the facts are these: The construction company held certain bonds of the Missouri Pacific company which had been received by it in payment for the construction of certain roads in which the first named company had acquired a controlling interest and which to the amount of $5,000,000 were, by resolution of the board of directors of the construction company sold to certain of its stockholders at a discount of ten per cent of their face value, resulting in an apparent net loss to the company of $500,000.  In this connection, it should be remembered that the action is not against the favored stockholders for a misappropriation of the funds of the construction company, neither is it in form or substance an action to pursue property which in equity belongs to the company.  That a corporation is entitled to recover against an unfaithful officer for the misappropriation of its funds is elementary law; and if, as alleged, the sale of the bonds was the consummation of a conspiracy on the part of George Gould, Russell Sage, and other directors, having for its ultimate object the wrecking of the construction company, they are, without doubt, answerable for their wrong when called upon for an accounting in an appropriate action.  It may also be assumed, although the question is not necessarily involved in this hearing, that contracts whereby officers of a corporation realize large profits directly or indirectly at its expense are presumptively fraudulent and voidable at the election of the latter.  But is the Missouri Pacific Railway Company answerable for the alleged wrongful act; and if so, upon what recognized principle of equity jurisprudence?  It is not contended that the last named company was present, in a legal sense,

partic<ipating in the sale of the bonds, or that it is the
recipient of any of the profits derived from or on account of
that transaction. If, therefore, it must account for the loss
to the construction company by reason of the profligacy of
the latter's officers, its liability depends upon other and dif-
ferent principles.

In order that the position of the plaintiff may not be
lost sight of in the contemplation of the complex transac-
tions involved, we copy here the brief but comprehensive
summary of his argument prepared by the reporter accom-
panying the opinion heretofore approved : "The sale by
the directors and purchase by the stockholders of the Mis-
souri Pacific bonds at a discount was a fraud. Neither the
directors nor the stockholders can buy or sell the property of
a corporation for less than its value without rendering them-
selves and all concerned liable. Without the aid of the
Missouri Pacific Company the fraud in the sale of the
bonds could not have been accomplished. There was due
to the construction company at the time it was forced to
borrow from Gould $2,500,000 in bonds the sum of
$3,170,000 in bonds of the Missouri Pacific Company.
The latter company acted with its directors and the direct-
ors of the construction company, and the resolution under
which the bonds were sold was for its benefit as well as
others. It received part of the fruits of the conspiracy,
and the wrong must be viewed as a whole. By conspir-
ing together for the purpose alleged the conspirators as-
sumed to themselves the attributes of individuality in the
prosecution of the common design, thus rendering what was
done by each in the execution of such design the act of
all." And on the argument it was said that the Missouri
Pacific Company, having been made the instrument of its
officers and managers in the perpetration of the fraud upon
the construction company, must be regarded as a wrong-
doer, and jointly liable with the other conspirators. The
evidence which is the foundation for that contention is in-

dicated by the twenty-eighth, twenty-ninth, fortieth, forty-first, forty-second, and forty-third findings of the district court, and which are here set out in full:

"(28.) The court further finds that at all times from the date of the organization of the Fitzgerald & Mallory Construction Company up to April 17, 1889, the plaintiff herein, John Fitzgerald, was a director of said construction company. That the directors of said company were five in number. That prior to November 3, 1886, a majority of said directors were friendly to the interests of the plaintiff. That since said 3d day of November, 1886, three of said five directors, together with the treasurer, have been directly or indirectly interested in the defendant railway company, have acted in the interest of said railway company in all matters concerning the management of said construction company, where the interest of the railway company and the construction company have come in conflict.

"(29.) The Missouri Pacific Railway Company failed to act in the authorization of the issuance of its bonds to pay over as provided in its contracts with the construction company until December 10, 1886, when, by its board of directors, it authorized the issuance of five million ($5,000,-000) dollars of Missouri Pacific five per cent trust bonds, and said bonds were issued in pursuance of said authorization under date of January 1st, 1887."

"(40.) The court further finds that on the 28th day of July, 1887, at a meeting of the board of directors of the Fitzgerald & Mallory Construction Company, held at New York city, where were present Russell Sage, R. I. Cross, and Sidney Dillon, and absent S. H. Mallory and the plaintiff herein, it was resolved to sell four million ($4,000,000) dollars Missouri Pacific railway five per cent bonds to the stockholders of the said construction company at ninety per cent of the face value, and Jay Gould, the president of the Missouri Pacific Railway Company, fur-

nished two million five hundred thousand ($2,500,000) dollars in bonds to add to one million five hundred thousand dollars ($1,500,000) bonds then possessed by the construction company, for the purpose of completing the required amount to make the sale. That under said resolution all the stockholders, with the exception of John Fitzgerald and S. H. Mallory, took their *pro rata* share of said bonds, and in the amount of three million two hundred thousand ($3,200,000) dollars. That when informed of said transaction the said Fitzgerald and Mallory protested against the same.

"(41.) That on said July 28, 1887, the full amount of said two million five hundred thousand ($2,500,000) dollars additional bonds furnished by Jay Gould was due the construction company from the defendant, the Missouri Pacific Railway Company, and the same should be treated as a payment by the said railway company to the construction company, and the said railway company should pay all charges made by the said Gould on account of said advancement.

"(42.) That on the 23d day of September, 1887, R. I. Cross, the treasurer of the construction company, paid from the funds of the said company the sum of sixty-two thousand five hundred ($62,500) dollars to Jay Gould on account of interest on the two million five hundred thousand ($2,500,000) dollars bonds delivered to the construction company July 28, 1887. That the said sixty-two thousand five hundred ($62,500) dollars so paid is a proper charge against the Missouri Pacific Railway Company, and in favor of the Fitzgerald & Mallory Construction Company in this action, and the same is allowed.

"(43.) That on the 22d day of September, 1887, at a meeting of the directors of the Fitzgerald & Mallory Construction Company, held in New York city, where all of the directors were present, a sale of bonds in the amount of one million eight hundred thousand ($1,800,000) dollars

[not] already sold [was] ordered made to the New York stockholders of the Fitzgerald & Mallory Construction Company *pro rata*, said sale being made at ninety per cent of par value. That it was further ordered at said meeting of directors that one million five hundred thousand ($1,500,-000) dollars of Missouri Pacific bonds be distributed among the stockholders of the construction company as a declared dividend upon stock."

It may not be out of place to look behind the foregoing findings to the record upon which they are based, and which, so far as evidenced by the books of the construction company, is found in the minutes of three meetings of the board of directors. The first of said meetings was held in New York, July 28, 1887, those present being R. I. Cross, Russell Sage, and Sidney Dillon, and the record, or so much thereof as relates to the subject in hand, is as follows :

"Mr. R. I. Cross, member of the committee appointed to investigate the condition of the company, reported, in substance, as follows: That the company is indebted to its stockholders to the extent of $1,500,000 for money borrowed; that it is indebted to the Missouri Pacific Railway Company $772,856.27, and to Morton, Bliss & Co. to the extent of about $600,000; that $500,000 would be required to complete the company's contract with the Missouri Pacific Railway Company. And thereupon the following resolution was adopted:

"*Resolved*, That the treasurer is hereby instructed to sell a sufficient amount of the Missouri Pacific Railway Company's trust five per cent bonds at not less than ninety cents, to provide funds to pay for the amount borrowed, amounting to $1,500,000 and interest; and that for the further purpose of the company the treasurer is authorized to sell further amounts of the same bonds at the same price to the extent of, say $4,000,000 in all, to the shareholders, with the understanding that the prorate share of these

bonds of any stockholder who is not prepared to take his share within ten days from this date shall be first offered to the other stockholders *pro rata.*

"On motion of Mr. Cross it was voted that the treasurer is hereby authorized to borrow from Mr. Jay Gould $2,500,000 of the Missouri Pacific Railway Company's five per cent bonds, to be returned to him when the construction company receives the bonds due under its contract with the Missouri Pacific Railway Company."

At the second meeting, on September 20, 1887, the directors all being present with the exception of Sidney Dillon, the following appears:

"After full discussion by members of the board, it was, on motion by Mr. Cross, voted that the treasurer of this company be and hereby is authorized to sell $2,000,000 of the Missouri Pacific Railway Company's five per cent bonds at ninety cents, to provide funds for the completion of the work of the construction company, and to give the stockholders *pro rata* the first option of buying the same. Mr. Cross also reported that Mr. Mallory's account showing the amount of money expended by himself and Mr. Fitzgerald previous to the execution of the contract was correct, and, on motion, they were given credit for that amount."

At the meeting of September 22, the following proceedings were had:

"NEW YORK CITY, September 22, 1887.

"Pursuant to call, meeting of the directors was held this day at No. 195 Broadway, New York.

"Present, S. H. Mallory, John Fitzgerald, Russell Sage, R. I. Cross, and Sidney Dillon.

"On motion of Mr. Dillon it was unanimously voted that the resolution passed at the last meeting of the directors providing for the sale of the Missouri Pacific Railway Company's five per cent bonds be amended so as to read as follows:

"*Resolved*, That the treasurer of this company be and hereby is authorized to sell $1,800,000 of the Missouri Pacific Railway Company's five per cent bonds at ninety cents, to provide funds for the completion of the work of the construction company, and that said bonds be sold to the following stockholders of the company who were ready to buy the same, as follows:

| | |
|---|---:|
| Russell Sage........................................... | $375,000 |
| Morton, Bliss & Co.................................. | 300,000 |
| Jay Gould............................................... | 675,000 |
| H. G. Marquand ...................................... | 150,000 |
| Sidney Dillon.......................................... | 150,000 |
| George J. Gould...................................... | 75,000 |
| I. & S. Wormser ..................................... | 75,000 |
| Total...............................................$ | 1,800,000 " |

The foregoing transactions do not include the $1,500,000 of bonds earned and delivered to the construction company upon the completion of the first 150 miles of road. The last named installment had been previously disposed of to the apparent satisfaction of all concerned, and does not call for further mention on this branch of the case. Mr. Mallory, president of the construction company, on being advised of the action taken at the meeting of July 28, addressed to Mr. Cross, treasurer of the company, the following letter:

"WINFIELD, KAS., Aug. 3, 1887.

"*R. I. Cross, Esq., Treasurer F. & M. Const'n Co.—* DEAR SIR: When I left New York it was supposed that the bonds were negotiated at par, etc., and I am much surprised to be informed to take my allotment in ten days or have them sold at 90. I object to this. I have had to stand a ten per cent reduction on 150 miles, and now another ten per cent on the whole is more than I can stand.

"I hereby subscribe for $400,000 five per cent Missouri Pacific bonds at 90, and will write to Mr. Gould to protect

me. If he does not, I desire to make loan from you at six per cent interest and I will secure with bonds and construction stock, I paying up Mr. Gould.

"Yours truly,      S. H. MALLORY."

And referring to the subject of the above communication. Mr. Mallory testified as follows:

Q. These $2,500,000 were disposed of for the benefit of the company, were they not?

A. I suppose that the $2,500,000 of bonds—that is a part of the $4,000,000.

Q. In the sale and disposition of these bonds at a discount of ten per cent, and when the stockholders took those bonds at ten per cent discount, did the Missouri Pacific Railway Company get any benefit out of that deduction, to your knowledge?

A. Not that I know of, but its stockholders got the benefit.

Q. The discount of ten per cent went to the benefit of your associate stockholders, who availed themselves of the opportunity?

A. Yes, sir.

Q. And the Missouri Pacific Railway Company, so far as you know, was not a party to the sale and disposition of any of those bonds at a ten per cent. discount?

A. No, sir.

Q. But you and Mr. Fitzgerald could have had the same benefit as the other stockholders if you had been in a position pecuniarily to have availed yourselves of it?

A. Yes, sir.

The foregoing is substantially all of the facts in evidence tending to characterize the transactions involved, and upon which the liability of the Missouri Pacific Company, if answerable in this action, must depend.

As stated in the former opinion, corporations are liable civilly for damages occasioned by the torts of their officers and agents committed while acting within the scope of their

authority as such; but although that principle may be regarded as fundamental, its practical application to the varied transactions of our commercial life is by no means free from difficulty owing to the want of a precise definition of the term "scope of authority." We have been referred to no clearer exposition of the subject than that found in Mechem, Agency, 312, viz.: "But while, as has been seen, authority is often to be implied from the conduct of the parties, yet it is a necessary and logical limitation upon the construction of such an authority that the power implied shall not be greater than that fairly and legitimately warranted by the facts. The reason of this rule is so apparent and so just that it needs no argument to support it. If the agency arises by implication from acts done by the agent with the tacit consent or acquiescence of the principal, it is to be limited in its scope to acts of a like nature; if it arises from the general habits of dealing between the parties, it must be confined in its operation to dealings of the same kind; if it arises from the previous employment of the agent in a particular business, it is, in like manner, to be limited to that particular business. In other words, an implied agency is not to be extended by construction beyond the obvious purpose for which it is apperantly created." In *Reynolds v. Witte*, 13 S. Car., 5, a very instructive case, it is said: "We must distinguish between the authority to commit a fraudulent act and the authority to transact the business in the course of which the fraudulent act was committed. Tested by reference to the intention of the principal, neither negligence nor fraud is within the scope of the agency, but tested by the connection of the act with the property is as much within the scope of the agency as negligence in allowing others to take it. The proper inquiry is, whether the act was done in the course of the agency and by virtue of the authority as agent. If it was, then the principal is responsible, whether the act was merely negligent or fraudulent."

And in a recent English case we find the following language: "Although a definition is difficult, I should say the act for which the master is to be held liable must be something incident to the employment for which the servant is hired and which it is his duty to perform." (*Stevens v. Woodward*, 6 Q. B. Div. [Eng.], 318.)   Like views are expressed in 2 Hill, Torts, 323; Angell & Ames, Corporations, sec. 311; Beach, Private Corporations, 448; *Evansville & C. R. Co. v. Baum*, 26 Ind., 70; *Mott v. Consumers Ice Co.*, 73 N. Y., 543; *Brokaw v. New Jersey R. & T. Co.*, 32 N. J. Law, 332; *Johnson v. Barber*, 5 Gilm. [Ill.], 425; *Sherman v. Dutch*, 16 Ill., 285; *Keedy v. Howe*, 72 Ill., 136; Evans, Principal & Agent, 558*; Smith, Master & Servant, 339*; 2 Thompson, Negligence, p. 885.   We are constrained to hold, from a careful re-examination of the subject, that our former conclusion in the application of the foregoing rule to the facts stated is indefensible.   The Missouri Pacific Company had, as we have seen, on and previous to the transaction above recorded, delivered to the construction company the full amount of bonds to which the latter was entitled, and had to that extent, at least, performed the obligations of its contract.   And it is not even charged that any portion of said bonds, or the proceeds thereof, were directly or indirectly returned to it.   The time of said delivery may become material in view of another question presented by the record, but can have no bearing upon the issue now under consideration.   It is sufficient for our present purpose that they were in fact delivered; that they became the property of the construction company, and were thereafter not subject to the control of the Missouri Pacific. True, a majority of the directors were, as found by the district court, friendly to the railroad company, and whenever its interests conflicted with those of the construction company voted against the interests of the latter; but how on this record could the railroad company have been interested in the sale of the bonds, whether at a discount or at a premium?

We assume for the purpose of this inquiry that the proofs warrant, not merely a finding of fraud by Gould and his associates, but that such fraud was accomplished by means of a conspiracy on the part of men officially related to the Missouri Pacific Company and presumably solicitous for its welfare. But we are unable to say from the record that the wrecking of the construction company, or the defrauding of its stockholders, was in any proper sense an incident to their powers or duties as representatives of the first named company, or so related to their employment as to be within the scope of their power according to the most liberal interpretation of the term. Had Sage, Dillon, and Cross, the three directors who are found to have been interested in the Missouri Pacific Company, at or prior to the meeting of July 28, entered into a conspiracy to defraud the construction company by embezzling and converting to their own use the $1,500,000 of bonds then owned and held by it, and had actually consummated their fraudulent purpose, we cannot conceive how the legal aspect of the case would have been essentially different. Yet no one will contend that the act of the conspirators would in that case be within the scope of their power as officers of the railroad company so as to render it liable for the result of their fraud. Equity is always solicitous of the rights of innocent stockholders of corporations, and although Jay Gould and his associates named in this record appear to own or control a majority of the stock of the Missouri Pacific Company, it is a matter of common notoriety, of which we must take notice, that there are many honest investors in that class of securities, and that some of the stock of that company is presumably held by persons innocent of any participation in the fraud charged. Now, if it is to answer in this action for the wrong alleged, the loss must be borne not alone by the participants in the fraud, but as well by the innocent and helpless stockholders. The foregoing fact is suggested, not because it is sufficient of itself to ex-

cuse a corporation for such wrongful acts of its officers as are clearly within the scope of their powers, but as a reason for caution by the courts in application of the recognized rule. Before leaving this subject it should be observed also that this action is, in its practical effect, one for an accounting by the construction company against the railroad company. It follows, as was said in the former opinion, that the proceeds of whatever judgment is rendered in favor of the plaintiff must, after satisfying the debts of the first named company, be distributed ratably among its stockholders; but, according to the record, eighty per cent of the stock of that company is held by Gould and the recreant officers above named, while the debts thereof appear to be trifling, not exceeding $60,000 in amount. It is evident, therefore, and such is the effect of our previous decision, that the allowance of this claim is to assess the sum of $500,000, not against Gould and his associates, but against the stockholders of the Missouri Pacific Company, and of which amount $400,000 and interest, less the ratable share of the debts of the construction company, must be turned over, not to Fitzgerald or Mallory, but to the very parties who are responsible for the confusion and disaster which overtook their venture.

But there is still another light in which the transactions in question may be viewed, and that is one suggested by the dissenting opinion heretofore filed, viz., that Messrs. Sage, Dillon, and Cross, the latter being at all times controlled by Gould, instead of acting in the interest of the Missouri Pacific Company were in fact using their positions of trust toward that company to profit personally at its expense and at the expense of its stockholders. It is sufficient, without further reference to the record, that the above conclusion is irresistible from the admitted facts, and is given especial emphasis as a ground of defense in the brief of counsel for the railroad company. Allusion is made to that fact in this connection merely for the pur-

pose of illustrating the attitude of the officers named toward the Missouri Pacific Company, the extent to which, if at all, the construction company or Fitzgerald and Mallory are affected by such corrupt purpose being reserved for consideration in connection with another branch of the case. It is further suggested as a ground for this claim, that in consequence of the failure of the Missouri Pacific Company to deliver its bonds at the several times specified in the contract, the construction company was delayed in the completion of its work and was thereby subjected to great loss, both of promised subsidies and prospective profits; but that fact, although charged as a part of the general scheme to defraud, is not made the basis of a distinct claim of relief. And, conceding all that is claimed for the evidence bearing upon that point, we are still unable to perceive the force of the plaintiff's reasoning, inasmuch as there is no apparent relation between the alleged breach of contract by the railroad company and the subsequent disposition of the bonds by the construction company. The rule which should control in this and like cases is aptly stated in *Warwick v. Hutchinson*, 45 N. J. Law, 61, viz.: "The wrongful act must be the act of the defendant, and the wrong done and the injury sustained must be as to each other the relation of cause and effect, and the damages, whether they arise from withholding a legal right or the breach of a legal duty, must be the natural and proximate consequence of the act complained of." (See, also, *Sycamore Marsh Harvester Mfg. Co. v. Sturm*, 13 Neb., 210; *Bridges v. Lanham*, 14 Neb., 369.) It follows that the claim based upon the discount of the bonds sold was rightly rejected by the district court and its action in that regard must be affirmed. This conclusion renders unnecessary an examination of the question of the alleged acquiescence to which prominence is given in the several briefs as well as the oral argument.

We will now briefly notice the claim in behalf of the

construction company on account of the sum of $62,500
paid to Jay Gould as interest, and to which reference is made
in the forty-second finding of the district court.   We said,
referring to this claim, in the former opinion : "That for this
amount, with interest, the Missouri Pacific Railway Com-
pany is liable to the construction company, as a necessary cor-
ollary, follows from the propositions heretofore discussed."
The contention of plaintiff's counsel was that the pretended
loan of the $2,500,000 of bonds by Gould was but a part
of the conspiracy against the construction company and
that the Missouri Pacific should be required to account for
interest paid thereon on the ground that the directors, as in
the transaction resulting in the disposition of the bonds,
were acting within the scope of their authority.   It was in
that view of the case that the claim was allowed, and it
follows naturally from what is here said with regard to the
liability of the Missouri Pacific Company that our former
decision will not stand the test of authority and that the
claim in question must accordingly be rejected.   But we
find in the record another sufficient reason for the same
conclusion.   The loan was one of bonds payable in kind,
and the claim in question is the precise amount of the semi-
annual interest thereon as represented by the September,
1887, coupons paid by the Missouri Pacific Company at
maturity, probably to Morton, Bliss & Co., the construc-
tion company's bankers, although the record is not clear on
that point.   But in the statement rendered by said firm
for the month of September we find the following entry on
the debit side of the account: "23d Sept., coups. $2,500,-
000 M. P. 5 per cent bds. borrowed of Jay Gould, $62,-
500." There is other evidence confirmatory to the above
and which leaves no room to doubt the payment of the
amount of this claim by the railroad company at maturity.
It is a fact worthy of note, too, in this connection that the
construction company does not claim to have returned said
bonds and coupons, but that on the contrary there is still

due thereon an admitted balance of $82,000.   Our conclu-
sion, after a careful scrutiny of the evidence explanatory
of the transaction under consideration, may be thus briefly
summarized: (1.) The transaction was a personal one be-
tween Gould and the construction company, for which the
Missouri Pacific Company is not responsible.   (2.) The
construction company ratified said transaction by receiving
and appropriating the bonds borrowed and voluntarily pay-
ing the interest accruing thereon with the knowledge and
approval of its directors, including the plaintiff as well as
Mr. Mallory, its president.

Our examination includes a further inquiry, and which
involves the claim in behalf of the construction company
for $150,000 on account of the enforced reduction of the
contract rate from $11,000 to $10,000 per mile for the first
150 miles of road constructed.   The allegations of the
plaintiff's bill, so far as they relate to this subject, are fully
set forth in the opinion of Commissioner RYAN above
mentioned and need not be repeated in this opinion.   But
preliminary to a consideration of the merits of that claim
we are met by the contention that the transactions out of
which it originated are in contravention of settled rules of
public policy, and therefore void *ab initio*.   Inasmuch as
our investigation has led to a conclusion at variance with
that stated in the opinion approved, as well as the able dis-
senting opinion of Commissioners RAGAN and IRVINE on
the former hearing, it is deemed proper to mention here
some of the facts which tend strongly to characterize the
transaction, so far as the construction company is con-
cerned, and which are especially significant as bearing upon
the question of the good faith of the minority stockholders,
Fitzgerald and Mallory.   Our views with respect to the
transaction, so far as it concerns the directors and others
officially related to the Missouri Pacific Company, suffi-
ciently appear from what has been said, and do not re-
quire further notice.   The district court, it should be re-

35

marked, determined that question in favor of the legality
of the contract by the twenty-fourth finding, as follows:

"(24.) The court finds that each and all of the above-
named contracts for the construction of the several roads
named were in nowise unconscionable contracts, but were-
fair and reasonable contracts, in which the interests of all
the parties to the several contracts were properly protected,
and at the time of the execution of the said contracts the ·
officers of the Fitzgerald & Mallory Construction Company,
who executed said contracts on behalf of the construction
company, acted in good faith in the interests of the construc-
tion company, and the officers of the Missouri Pacific Rail-
way Company, who executed said contracts on behalf of
said railway company, acted in good faith in the interest of
the said railway company."

The above finding, so far as it asserts the good faith of
the Missouri Pacific Company, cannot be sustained, since,
as we have seen, it is, even according to the contention of
that company, clearly against the evidence.   It is charged
in paragraph three of the plaintiff's bill, and fully estab-
lished by the proof, that at the date of the contract with
the Denver, Memphis & Atlantic Railroad Company, to-
wit, April 6, 1886, and the subsequent contract with the
Missouri Pacific Company, on May 4 following, the direct-
ors of the construction company were John Fitzgerald, the
plaintiff herein, S. H. Mallory, S. S. King, T. M. Stuart,
and Edward A. Temple, but that after the officers of the
Missouri Pacific acquired a majority of the stock of the
last named corporation they demanded the resignation of
all of said directors except Fitzgerald and Mallory, and
that on the 3d day of November, 1886, the board of direct-
ors were chosen to which reference is made in the twenty-
eighth finding above set out.   We have searched the record
in vain for evidence tending to prove that the construction
company, as organized at the date of said contracts, con-
templated any other than legitimate transactions.   It is

true the agreed rate for the construction of the Denver,. Memphis & Atlantic line may appear exorbitant in the light of subsequent contracts, but the explanation thereof seems altogether reasonable, viz., that the securities of that. company would have little marketable value compared with the bonds of the Missouri Pacific, in which Mr. Gould was personally interested, and in which he was investing his private fortune. But the record does contain evidence of good faith on the part of the construction company. On the 30th day of October, 1886, Mr. Mallory, as president, made and published the following statement:

" *To the Stockholders of the F. M. C. Co.*: Mr. Gould advises me that he offers 120 for F. M. C. Co. stock and Mo. P. take road and pay all liabilities of Const. Co. The following statement is made for our information : We have now 115 miles of track down, the grading and bridging mostly done on ninety-eight miles more and expect to get track on by July 1. The following is the estimated cost. of 203 miles at $11,128 per mile, $2,268,638.84, for which we should receive per contract, 203 miles, $12,000, Mo. Pac. bonds.....................................$2,436,000 00·
Subsidies...........................................   456,000 00
                                                      _____
                                                      $2,892,000 00
                                                      _____

                                                      $623,861 16
Making a dividend of forty-one per cent on $1,500,000 stock. When construction company was formed and contract made with Mo. Pac. it was not expected that over thirty per cent would have to be called in. Now it is the western stockholders who have made it possible for you to realize forty per cent in less than an average of six months. time. We gave you an equal interest with us without any bonus, expecting that you would provide the necessary funds to carry on the work. Your means are at command—ours. in land, merchandise, banks, etc., not easy to realize on. We built 200 miles of railroad in six months, therefore we

think that if it is thought best to terminate contract or sell out stock, that the Missouri Pacific pay forty per cent, which is no more than the contract price—at same time get a cheap road, worth more than it costs, and also to give to Mallory & Fitzgerald the town sites on line now under construction which have been secured by Town Site Company. * * * We went into the project in good faith, and have so acted. Statements and reports have not been made, probably, as should have been done. What we thought of was to get road, other things would take care of themselves, which I see has caused a feeling of distrust in your mind, and we are ready for any equitable adjustment. Under our contract there is 200 miles more of road not yet started on which the profits will equal those already earned."

In a subsequent statement, the date not appearing, Mr. Mallory says:

"The F. M. Construction Co. was organized with $1,000,-000 capital. For reasons well known to all, capital was increased to $1,500,000, which was considered ample to build road and complete contracts. The control of the company was taken by New York people. It was expected that the company finances would be looked after for all alike. * .* It is a well known fact that the western stockholders are not able to furnish means to build their portion of the 591 miles of road. The balance are. Our bonds were not sold when they could have been at par, and owing to circumstances over which we have no control we are compelled to take a discount of ten per cent. At the west end I have endeavored to give the eastern stockholders all the benefits arising from the construction of the road, and now I claim the company should take such steps as are necessary to procure funds to complete contracts."

The foregoing quotations are reinforced by other evidence, but are sufficient for our purpose, and satisfy us that prior to the ascendancy of the Gould interest in the man-

agement of the construction company, its only purpose was to make a legitimate, although liberal, profit out of said contracts, and that Fitzgerald and Mallory have been victims and not perpetrators of any wrongs subsequently committed in its name or through its agency.

There is also a question of pleading presented in this case. 'The legality of the several contracts is not assailed by answer or otherwise in the answer. The rule is correctly stated in the dissenting opinion as follows: "When upon the trial it is apparent from the evidence material to the issues that the cause of action rests upon an agreement against public policy the court will of its own motion refuse to enforce such agreement when the parties are *in pari delicto*." It may be added, however, as the essence of the authorities, that where the illegality of an agreement is not suggested by the plaintiff's pleadings or proofs it must, in order to be available to the adverse party, be especially pleaded. (*Wilde v. Wilde*, 37 Neb., 891.) If the parties hereto are *in pari delicto* within the rule stated, it is by reason not of the original scheme for the building of the Denver, Memphis & Atlantic road on the contracts mentioned, but on account of the subsequent manipulation thereof in fraud of the rights of the stockholders of the Missouri Pacific Company or others; and if the transactions alleged as the basis of this action are void for illegality, it is by reason of some fact or facts not disclosed by the plaintiff's bill or proofs, and should therefore have been pleaded by the respondent company.

Coming now to the merits of the claim, let us first ascertain the terms of the contract under which the 150 miles of road in question was constructed. The only specifications descriptive of the character of the work are contained in the following quotation from the contract of May 4: "The railroad to be constructed for the Denver company shall be of standard gauge, of not less than 56-pound steel rails, 2,600 ties to the mile, with stations not more

than eight miles apart, and water stations not more than twenty miles apart, and shall be equal in its general character to the roads now being constructed by the Missouri Pacific Railway Company in the state of Kansas, all subject to the approval of the chief engineer of the Pacific Company." By another provision payment was to be made for each ten miles of road as constructed, the contract price as finally agreed upon being $11,000 per mile, in the five per cent trust bonds of the Missouri Pacific Company. On May 25 Mr. Mallory addressed the vice president of the Missouri Pacific, Mr. Hopkins, advising him that ten miles of road would be completed the next week, and adds, "I suppose you are attending to the bonds." On June 7 he addressed Mr. Hopkins as follows: "We will want another 10 P. C. June 20 and another July 10 unless you can make disposition of bonds or make a loan for the company. If bonds are not ready I suggest a loan." On June 15 Mr. Hopkins addressed Mr. Mallory as follows: "Yours of May 25 and June 7 received. I find it will take some time before we can get the trust company to cancel bonds and mortgage. * * * Our attorneys inform us that this company cannot issue its bonds without calling a meeting of the stockholders to obtain their permission. This will make some delay and prevent any sale of bonds for the present, so you will have to obtain what money you want by calls on the stockholders." On October 10 Mr. Mallory wrote Mr. Hopkins as follows: "Under our contract the road should have been paid for in ten-mile sections. If this had been done the calls made would not have been necessary. * * * Funds are now needed to pay estimates and pay rolls. If not furnished the work will be delayed and subsidies jeopardized." It was this failure to pay for the road as constructed that occasioned the two statements of Mr. Mallory heretofore set out and which was continued until February 7, 1887, on which day a meeting of the directors was held in the city of New York, with the following result:

"195 BROADWAY, NEW YORK CITY,
                    "February 7, 1887.

"An adjourned meeting of the directors of the Construction Company was held this day, at which were present S. H. Mallory (who was chairman of said meeting), George J. Gould, R. I. Cross, and Russell Sage; also Mr. Jay Gould.

"The minutes of the previous meeting were read, and on motion of Mr. Sage were approved.

"Mr. Jay Gould, on behalf of the Pacific Company, stated that certain portions of the Denver railway were unsatisfactorily constructed, and for that reason the Missouri Pacific would decline to pay more than $10,000 per mile for the 150 miles of railroad built; that the Pacific Company was ready to take the road at that price.

"On motion of Mr. Cross, it was voted that the proposition of the Pacific Company to receive the 150 miles at $10,000 per mile be accepted."

The foregoing record and correspondence is set out, not because it sheds any direct light upon the subject of the completion of the road, but as preliminary to the principal question and as illustrating the relations of the parties to each other at the time of the alleged reduction. The findings of the district court on that issue are as follows.

"(14.) On the 15th day of June, 1886, the said construction company had ten miles of said road completed and ready for delivery to the Missouri Pacific Railway Company. That on the 15th day of July, 1886, the construction company had thirty miles of said road completed and ready for such delivery. That on the 14th day of February, 1887, the construction company had one hundred and fifty miles of said railroad completed and ready for delivery, with the exception of some finishing work upon the road-bed, bridges, and cattle guards. That on August 1, 1887, said road was entirely completed.

"(15.) That said railroad was turned over and delivered

to the defendant the Missouri Pacific Railway Company
by the defendant the Fitzgerald & Mallory Construction
Company, as follows : One hundred and fifty miles on the
14th day of February, 1887 ; twenty-nine and eighty-
three hundredths miles on the 11th day of August, 1887 ;
ninety-three and fifty-seven hundredths miles on the 11th
day of August, 1887 ; one hundred and twenty-four and
forty-two hundredths miles on the 1st day of October,
1887 ; twelve and eighty-two hundredths miles on the 15th
day of December, 1887."

It is, as we have seen, contended by the Missouri Pacific
Company that the action of the board of directors of the
construction company on February 7, 1887, was simply the
settlement and satisfaction of a disputed claim, and should,
therefore, be upheld by the applications of familiar princi-
ples; but to that proposition we cannot assent.   In the first
place it is not shown that there was a *bona fide* dispute be-
tween the parties, while on the other hand the evidence
tends strongly to prove that the claim with respect to char-
acter and condition of the work was a mere pretense on the
part of the Missouri Pacific Company, or of Mr. Gould in
its name.   The latter had inspected a portion of the first
150 miles of road in the month of September previous, and
his objection to the work is indicated by one answer, viz. :
"I told Mr. Mallory the work was very defective, badly
located and badly constructed, and I told him I would feel
ashamed to ask the Missouri Pacific to accept it."   George
Gould, who accompanied the last named witness at the time
mentioned, testified:  " Well, I distinctly recollect that Mr.
Jay Gould was thoroughly disgusted with the way the road
had been built, and he told Mr. Mallory so.   Becoming
tired and disgusted, he came back before he had gone quite
over the road.   I remember he stated that it was in such
bad condition that he would not go further over it, and told
Mr. Mallory he would have the Missouri Pacific engineer
go over the balance and make a report to him.   *   *   *

He was particularly disgusted with the alignment of the road. There was an unnecessary amount of curvature." Mr. S. H. H. Clark, who was also one of the party, testified in his examination in chief that with the exception of the alignment and broken grades and the ties, he considered it a fair road. He also testified that Mallory's attention was directed to the fact that some of the ties were inferior in size and quality, and that the latter agreed to put in 176 extra ties per mile. We have not searched the record in order to determine whether the defendant company was a party to the location of the line, since the strong presumption is that the route, if not actually located, was at least approved by the engineering department of the road, hence objections on account of the alignment after the road was completed and ready for delivery should not be regarded with favor. It is unnecessary to refer to the plaintiff's evidence as to the condition of the line in September, 1886, or even in February, 1887, since it is as well established as a disputed proposition can be, that it was finally completed according to the terms of the contract, under the direction and at the cost of the construction company. It is a fact worthy of comment that Mr. McLaughlin, chief engineer of the Missouri Pacific, was not produced as a witness, although Mr. Thayer, the engineer under whose direction the work was carried on, had testified in behalf of the plaintiff that he had gone over the line with him, McLaughlin, about February 13, 1887, when the road was finally inspected and approved by the latter, and the only objection made thereto was to suggest an improvement in one bridge, which was subsequently made. In the record of the meeting of February 7 no mention is made of the chief engineer or suggestion that he had refused to accept the road on account of the defective construction, or that the work was not equal in character to other lines constructed by the defendant company in Kansas.

During the argument, in response to a question by the writer relative to the expense incurred by the Missouri Pacific Company in completing this particular 150 miles of road, it was answered, without being challenged, that the road was fully completed by the construction company. And it is conceded that subsequent to the meeting of March 7 the last named company, at its own expense, employed from 250 to 350 men on that part of the line for a period of from one to three months in taking out false work, putting in truss bridges, widening banks and excavating, etc. Briefly stated, the construction company, on the demand of the Missouri Pacific, first accepted a reduction of $1,000 per mile to compensate for an alleged breach of contract, and proceeded immediately at its own expense to complete the road according to the letter of the agreement, so that the railroad company, in addition to the road for which it contracted, was enriched to the amount of $150,000 out of the treasury of the construction company.    We must confess to overlooking the unconscionableness of the transaction in our admiration for the genius which could conceive and successfully execute such a plan.    The rule has been long recognized, and may be regarded elementary, that a debt cannot be extinguished by the payment of a part thereof unless made and accepted upon a new and sufficient consideration. (*Fitch v. Sutton,* 5 East [Eng.], 230; *Heathcote v. Crookshanks,* 2 T. R. [Eng.], 24; *Harrison v. Close,* 2 Johns. [N. Y.], 448; *Keele v. Salisbury,* 33 N. Y., 648; *Hastings v. Lovejoy,* 140 Mass., 261; Bishop Contracts, 412.)

Another intrinsic vice of the transaction is that a majority of the directors of the construction company were, by reason of adverse interest, disqualified to act therein. The action of February 7, 1887, differs from that resulting in the disposition of the bonds, since the Missouri Pacific Company was one of the contracting parties, and represented at said meeting by Mr. Gould, whose dominion over both corporations, it appears, was absolute.    The directors

of the construction company present thereat were Messrs. Mallory, who acted as president, Cross, George Gould, and Sage, the two latter being also directors of the Missouri Pacific Company. One who is agent for two parties cannot, in the absence of express authority from each, represent both in a transaction in which their interests conflict. (Morawetz, Corporations, 528; Mechem, Agency, 455.) And never was the infallible truth that a man cannot serve two masters better illustrated than by the facts of this case. Each party to the agreement was interested in securing the most advantageous terms consistent with fair dealing and the rights of the other, hence Messrs. Gould and Sage could not at the same time protect the rights of both corporations. Conceding the personal integrity of the directors named, as well as of Mr. Cross, who acted with them, still the law has placed the seal of its disapproval upon the transaction and pronounced it fraudulent, not on account of any imputed evil purpose on their part, but from motives of public policy. It was said in *Gorder v. Plattsmouth Canning Co.*, 36 Neb., 548: " The relation of directors to the stockholders of a corporation is not essentially different from that ordinarily existing between trustees and *cestui que trust.* Courts of equity will set aside such contracts for fraud, and generally on a slight showing of fraud on the part of the trustee." And the proposition that this transaction is fraudulent as against the construction company, without regard to the motives of the directors named, is sustained by the following among the many cases which might be cited to the same effect: *United States Rolling Stock Co. v. Atlantic & G. W. R. Co.*, 34 O. S., 450; *Kitchen v. St. Louis, K. C. & N. R. Co.*, 69 Mo., 204; *Flagg v. Manhattan R. Co.*, 4 Am. & Eng. R. R. Cases [N. Y.], 141; Beach, Private Corporations, 247.

The alleged settlement is voidable for another reason viz., it was procured under circumstances amounting to practical compulsion, which is nearly related to duress, and

may be made the ground of relief either at law or equity. A payment or concession exacted will be held compulsory when made or allowed through necessity in order to obtain possession of property illegally withheld, where the detention is fraught with great immediate hardship or irreparable injury. (Pollock, Contracts, 555*; *Astley v. Reynolds*, 2 Strange [Eng.], 915; *Shaw v. Woodcock*, 7 B. & C. [Eng.], 73; *Cobb v. Charter*, 32 Conn., 358; *Harmony v. Bingham*, 12 N. Y., 99; *Stenton v. Jerome*, 54 N. Y., 480; *Peyser v. Mayor*, 70 N. Y., 495; *Spaids v. Barrett*, 57 Ill., 289; *Chandler v. Sanger*, 114 Mass., 365; *Lonergan v. Buford*, 148 U. S., 581.) The contract, as we have seen, provides for payment on the completion of each ten miles of road. Thirty miles thereof was completed as early as July 15, 1886, and according to the statement of Mr. Mallory, under date of October 30, 1886, there was then completed 115 miles of road and, in addition thereto, 98 miles which would be finished not later than January 1 following. The only response to the repeated calls upon the Missouri Pacific for money was assessments of the stock of the construction company until increasing demands had exhausted not only the resources of the company but the private funds as well of Messrs Fitzgerald and Mallory. So that at the date of the meeting in February both the individuals named and the company were confronted by bankruptcy and financial ruin. It was under these circumstances that the construction company chose to accept payment at the rate of $10,000 per mile instead of the contract price, rather than the alternative of an entire abandonment of the enterprise in which it was engaged, and that such action was compulsory within the rule established by the authorities cannot on the record be doubted.

It is the province and delight of equity to brush away mere forms of law, whenever designed as an ambuscade from whence to assail either public or private rights. Such, in substance, is one of the maxims of the law, and never

was it more fittingly applied than to the facts of this case. But it is strenuously insisted that both the complaining stockholders and the construction company are, by reason of their acquiescence in the alleged compromise, now estopped to deny its legality. Let us briefly examine that question in the light of the record. Mr. Mallory, referring to the subject, testified: "I objected to the throwing off of the $1,000 per mile at all times, but the majority of the board accepted it and I had to acquiesce." Mr. Black, secretary of the Denver Company, who was present at the meeting of February 7, was asked if Mallory consented to the proposition of Mr. Gould, and in reply said: "I don't think he did, not at the meeting at least, because at the meeting he opposed it and made quite a lengthy statement in opposition. He said the company had earned the full contract price and was entitled to it." Mr. Fitzgerald, who was not present at that meeting, testified that on learning of the action taken by the board he objected, and soon thereafter talked the matter over with Messrs. Sage and Dillon, who would not consent to a correction. He protested at different times to other members of the board and threatened suit for the recovery of the balance claimed, but offered no resolution to rescind the action complained of. Acquiescence in a fraudulent transaction is in effect a new agreement made consciously with an intent to condone the wrong done, and will not be inferred from doubtful evidence, but should be established like any other material fact, by the party asserting it. We are referred to no positive act indicating acquiescence in this instance, the only claim being that it should be inferred from the time intervening between the date of the action complained of and the institution of the suit, to-wit, one year, ten months, and seventeen days. Time alone, unaffected by other circumstances, will not bar the right to rescind a voidable transaction, since it is not for a wrong-doer to impose extreme vigilance and promptitude as conditions to the exercise of the rights of the injured party. (Pollock,

Contracts, 548*; *Pence v. Langdon*, 99 U. S., 581; *Montgomery v. Pickering*, 116 Mass., 227; *Tarkington v. Purvis*, 128 Ind., 187; *Maxon v. Payne*, L. R., 8 Ch. App. [Eng.], 881; *Foley v. Holtry*, 41 Neb., 563.)

There is still another contention of the defendant company which calls for notice in this connection, viz., that there is a defect of parties hereto. It is said that the action in this class of cases is primarily against the defaulting directors or officers and that the proceeding against the corporation is but an incident thereto, from which it is argued that George Gould, Sage, Dillon, and Cross are necessary parties to a determination of this controversy. The case of *Slattery v. St. Louis & New Orleans Transportation Co.*, 91 Mo., 217, to which we have been referred, appears to sustain the proposition contended for. But unfortunately for the defendant that objection was not made by answer or demurrer and is not now available, inasmuch as the case actually made involves only the rights of parties before the court. (Civil Code, sec. 46; Boone, Code Pleading, sec. 51; Maxwell, Code Pleading, p. 66; *Reformed Presbyterian Church v. Nelson*, 35 O. S., 638.)

It is deemed unnecessary to restate the entire account between the defendant and the construction company. We are, after a careful comparison, however, constrained to adopt the method of computation employed in the dissenting opinion as the more satisfactory, and which has the apparent approval of the defendant company. To the finding therein in favor of the construction company we add the further sum of $150,000, being the balance due at the contract rate for the first 150 miles of road, with interest. The account may accordingly be summarized thus:

| | |
|---|---|
| Balance as per previous finding | $63,816 95 |
| Interest to January 1, 1895 | 4,839 38 |
| Additional allowance | 150,000 00 |
| Interest at seven per cent to January 1, 1895, | 82,250 00 |
| | $300,906 33 |

Fitzgerald v. Fitzgerald & Mallory Construction Co.

In the plaintiff's amended bill he prays for a receiver to wind up the business of the construction company and to distribute its property among the stockholders thereof, after paying and satisfying all of its just debts, and a supplemental application has been addressed to us for the appointment of a receiver here instead of remanding the cause for final action by the district court. We should, in view of our settled practice, feel constrained to dismiss the application summarily, but realizing that we are not without blame for the long delay in this court, to the prejudice of all parties concerned, we have decided to retain the cause for such further action as may hereafter be deemed appropriate. The usual and orderly course of procedure would be through the agency of a receiver. The application is, however, resisted in this instance for reasons which will be here noticed.

The first objection which we notice is that this court is without jurisdiction of the action, and which is seriously urged, notwithstanding the hearing of the cause on its merits in the district court and in this court. From the record submitted in connection with the supplemental proceeding it appears that the cause was at one time removed into the circuit court of the United States for the district of Nebraska on the petition of the Missouri Pacific Company; that there was thereafter a plea to the jurisdiction of that court and a motion to remand, both of which were overruled by the district judge, but that subsequently an order remanding the cause was made by the circuit judge. The last named order is, it is contended, in excess of authority and void, hence the circuit court still has jurisdiction of the action. We will not examine the grounds for that claim. It is a sufficient answer that in all cases of apparent conflict between the state and federal courts the latter are the exclusive judges of their jurisdiction over the subject of the action. (*Freeman v. Howe*, 24 How. [U. S.], 459.) We must, therefore, decline to review the finding by the cir-

cuit court against its jurisdiction of this cause or the order remanding it to the district court of Lancaster county.

The second objection is based upon the following facts: On the 24th day of December, 1888, John Fitzgerald personally sued the Fitzgerald & Mallory Construction Company in the district court of Lancaster county on account for money and material furnished and services rendered. Said cause was removed to the circuit court for the district of Nebraska, where a trial was had, resulting in a judgment for the plaintiff therein in the sum of $51,-412.62, which was subsequently affirmed by the supreme court of the United States, and is still unsatisfied; that an order of attachment was issued from the district court of Lancaster county, and served by summoning the Missouri Pacific Company, as garnishee of the construction company, and that in the final judgment the said garnishee was ordered and adjudged to hold, subject to the further orders of the circuit court, all money owing by it to the said defendant; wherefore it is said that whatever sum is now due from the defendant to the construction company is in the custody of that court and beyond the control of a receiver named by us. A critical examination of that proposition is rendered unnecessary, since counsel have overlooked the fact that the attachment proceeding was evidently abandoned in the circuit court, where the record shows an ordinary judgment for damage unaccompanied by an order against the Missouri Pacific Company as garnishee. This case is therefore plainly distinguishable from *Reed v. Fletcher*, 24 Neb., 435, and *Northfield Knife Co. v. Shapleigh*, 24 Neb., 635, cited by defendant.

Lastly, it is objected on the ground that a receiver for the construction company was named by the circuit court for the district of Nebraska on the 12th day of January, 1895, in a suit brought against it by by the Kansas, Colorado & Pacific Railroad Company, a Kansas corporation. It is a rule, recognized alike by state and federal tribunals, that

the court which first acquires jurisdiction of the subject of an action will retain such jurisdiction until the final determination of the controversy. Indeed, as remarked by Mr. Justice Swayne in *Taylor v. Taintor*, 16 Wall., 370, "It is indeed a principle of universal jurisprudence that where jurisdiction has attached to person or thing, it is, unless there is some provison to the contrary, exclusive in effect until it has wrought its function." (See, also, *Home Ins. Co. v. Howell*, 9 C. E. Greene [N. J.], 238; *Ackerly v. Vilas*, 15 Wis., 401; *Taylor v. Corryl*, 20 How. [U. S.], 583; *Freeman v. Howe*, 24 How. [U. S.], 450; *Ober v. Gallagher*, 93 U. S., 199.) No sufficient reason having been suggested for denying the application, a receiver will be appointed with authority to collect the amount here adjudged against the defendant company, and to disburse the same under the directions of the court. Decree for plaintiff in the sum of $300,906.33, to draw interest from the first day of this term.

DECREE ACCORDINGLY.

RYAN, C., adheres to the views heretofore expressed by him.