WOODMEN OF THE WORLD LIFE INSURANCE SOCIETY, APPELLANT, V. AMERICAN SOCIETY OF COMPOSERS, AUTHORS, AND PUBLISHERS ET AL., APPELLEES.

JOSEPH MALEC, APPELLANT, V. AMERICAN SOCIETY OF COMPOSERS, AUTHORS, AND PUBLISHERS ET AL., APPELLEES.

19 N. W. 2d 540

FILED JULY 13, 1945. Nos. 31921, 31922.

*Hotz & Hotz* and *Rainey T. Wells,* for appellant.

*Kennedy, Holland, DeLacy & Svoboda, Eugene N. Blazer, Schwartz & Frohlich,* and *Herman Finklestein,* for appellees.

Heard before SIMMONS, C. J., PAINE, CARTER, MESSMORE, YEAGER, CHAPPELL, and WENKE, JJ.

MESSMORE, J.

The two cases constituting the subject of this appeal, by agreement, are consolidated. They are actions at law to recover money judgments wherein the plaintiffs, pursuant to contracts made with the defendant, paid the defendant in compliance therewith and seek to recover the money so paid. A jury was waived and trial had to the court. The court entered judgment for the defendant. Motion for new trial was argued, submitted and overruled. Plaintiffs appeal.

The plaintiff, Woodmen of the World Life Insurance Society, is a fraternal, beneficial society, incorporated under the laws of Nebraska and duly authorized to operate the radio station known as W.O.W., situated in Omaha. For convenience this plaintiff will be referred to as the "society."

The plaintiff, Malec, is the assignee of 26 contracts that were entered into by music users with the defendant, and will be referred to as "Malec."

In the alternative, the plaintiffs will be referred to as appellants.

The defendant, American Society of Composers, Authors and Publishers is a voluntary association organized and existing under and by virtue of the laws of New York, com-

monly referred to as ASCAP, and will hereafter be so designated.

Eugene N. Blazer, defendant (appellee) represented ASCAP in Nebraska as their agent, and will hereafter be referred to as "agent."

The issues raised in the pleadings pertinent to a determination of this appeal are considered in the opinion with reference to the contentions of the respective parties.

The record discloses that on July 18, 1923, the society entered into a contract with ASCAP. Thereafter the contracts continued year after year on a fixed license fee. On September 1, 1932, the society and ASCAP entered into a contract that fixed a sustaining fee and a graduated scale of 3, 4, and 5 per cent of the net proceeds taken in by the society from its radio station, for a period of three years, the contract to terminate December 31, 1935. The license and sustaining fee provided for by the contract gave the radio station the right to perform publicly for profit copyrighted vocal and instrumental music compositions owned and controlled by ASCAP. At the expiration of this contract ASCAP wired the society in substance, on December 30, 1935, that it was prepared to extend the contract on the same terms for five years. On January 11, 1936, ASCAP again wired the society, calling attention to its previous telegram and stating, in substance, that unless it heard from the society by January 15, 1936, the offer of the extension of the contract was accepted, it would consider the society as an infringer if the society performed ASCAP music for profit without a license. On January 15, 1936, the society, by wire, requested the contract be continued. The contract provided $1,500 per year for a sustaining fee, and 5 per cent per year of the net receipts of the society's radio station. The contract was to terminate December 31, 1940.

The contracts held by Malec, as assignee, were termed annual "blanket" license fees for the right to have rendered upon the premises of the assignors copyrighted vocal and instrumental music compositions controlled by ASCAP.

These contracts were automatically extended, unless notice was given to terminate them, as provided therein. They were taken out by hotels, dance halls and pavilions, night clubs and others, and carried a specific consideration which varied according to the business, except radio stations, the latter on a basis like radio station W.O.W. The collections under the latter contracts were made by the agent and signed by him as agent and attorney in fact. This was also true of the society's contracts prior to September 1, 1932. There is no question but that all of such contracts were valid at the time they were entered into.

Under the United States Copyright Act, 17 U. S. C. A., sec. 1, the creator of a musical composition acquires certain exclusive rights where his work is copyrighted, among which is the right to publicly perform music for profit. Due to this right, the voluntary association of ASCAP came into being. This association was formed in 1914, under the guidance of Victor Herbert (a composer of music) and some of his contemporaries. The primary purposes of the voluntary association are to protect composers, authors and publishers of musical works against piracies of any kind; to facilitate the administration of the copyright laws for the protection of composers, authors and publishers of music works; to grant licenses and collect royalties for the public presentation of works of its members by instrumentalists, singers, mechanical instruments, radio broadcasting stations, or any kind of combination of singers, and to allot and distribute such royalties; to adjust and arbitrate differences and controversies between its members and others, and to represent its members in controversies, actions and proceedings involving the right of public performances of any of the works of its members. In other words, the association constitutes an agency analagous to a clearing house for its writer and publisher members. The rights obtained under the copyright law are assignable, and the member copyright owners assign this right to ASCAP who, in turn, makes licenses available to the commercial users of music entitling the holder to publicly perform for profit any of the compositions of the members.

On May 17, 1937, legislative bill No. 478, chapter 138, Laws 1937, p. 488, became effective, now appearing in article 13, sections 59-1302 to 59-1320, inclusive, R. S. 1943. The act made it unlawful for any described combinations of copyright owners to operate in this state. Section 59-1302 provided that any such combination was an unlawful monopoly and a combination in restraint of trade. Section 59-1307 declared: "All existing contracts, agreements, licenses or arrangements now existing within this state made by any person, firm or corporation with any combination, declared unlawful under section 59-1302, are hereby declared void and nonenforceable in any court within the boundaries of this state, * * * ", thus denying any such combination access to the courts of Nebraska for the purpose of enforcing its rights and those of its members. The effect of the act was to outlaw ASCAP and forbid it to do business in this state.

On June 7, 1937, Gene Buck, a member of ASCAP and at that time its president, filed a petition in the United States district court for the district of Nebraska, Lincoln division, to restrain and enjoin the Attorney General and the various law enforcing officers of this state from enforcing legislative bill No. 478, chapter 138, Laws 1937, p. 488, now article 13, sections 59-1302 to 59-1320, inclusive, R. S. 1943, against ASCAP. A temporary injunction was obtained November 13, 1937, and on January 25, 1940, the temporary injunction was made permanent and perpetual. The court, composed of three federal judges, declared the act unconstitutional, in violation of the due process and the equal protection clause, Amendment XIV of the Constitution of the United States, as well as the federal copyright act, and that the separability clause in the act did not apply. See *Buck v. Swanson*, 33 F. Supp. 377. The case was appealed to the Supreme Court of the United States, and on May 26, 1941, the injunction was dissolved, the case reversed and dismissed.

In *Watson v. Buck*, 313 U. S. 387, 61 S. Ct. 962, the Florida act was involved, which was similar to the Nebraska act,

and the questions raised in *Marsh v. Buck*, 313 U. S. 406, 61 S. Ct. 969, which involved the Nebraska act, were for the most part determined in the former case. In *Watson v. Buck, supra*, the court said: "We are pointed to nothing either in the language of the copyright laws or in the history of their enactment to indicate any congressional purpose to deprive the states, either in whole or in part, of their long-recognized power to regulate combinations in restraint of trade. * * *

"Under the findings of fact of the court below, ASCAP comes squarely within the definition of combinations prohibited by section 1 of the 1937 act."

ASCAP discharged its local agent and quit doing business in the state when the opinion in *Watson v. Buck, supra*, was rendered.

The appellants broadly assert that by the Supreme Court of the United States dismissing the injunctive action of the plaintiffs therein, the Nebraska legislation in its entirety was sustained and approved. The Supreme Court dealt with and sustained, as separable from the other criticized portions of the act, only what is now section 59-1302, and if there be any doubt upon that understanding, it is eliminated by the following language from *Watson v. Buck, supra*, which is the basic opinion on the question: "But at this time the record does not justify our passing upon any part of the statute except, possibly, that phase which prohibits activities in Florida by combinations declared unlawful."

The ultimate decision of the Supreme Court of the United States rested solely upon the validity of what is now section 59-1302, R. S. 1943. See *Remick Music Corporation v. Interstate Hotel Co.*, 58 F. Supp. 523, 541.

It is apparent that there is not the slightest warrant for the appellants argument that the act in its entirety was declared constitutional.

Having in mind the foregoing, a brief résumé of the evidence is appropriate. ASCAP collected from the contract holders from and after May 17, 1937, to approximately May 26, 1941. These are the payments involved in this appeal.

The payments made by the contract holders are reflected by two exhibits, exhibits 28 and 28½, the latter a corrected statement of the computation. The society contends a discrepancy exists in the exhibits, in that exhibit 28½ reflects payments made by the society monthly, and in fact no payments were made by it after the suit filed by ASCAP, June 7, 1937, until ASCAP had obtained a temporary injunction against the enforcement of the act, November 13, 1937, then the payments were resumed. However, throughout this period of time music controlled by ASCAP was played by the contract holders.

It will be remembered the Nebraska act became effective May 17, 1937. Thereafter, on May 22, 1937, the manager of the society, by letter, enclosed the society's check to cover the payment for April, 1937. These payments continued in continuity, with the exception previously noted, throughout 1937, 1938, 1939, and 1940, for a period of 100 months. On January 20, 1941, the auditor of the society wrote to ASCAP, in substance, as follows: "Replying to yours of the 17th instant, may we advise you that it is our belief that our check No. 64768, for $3,287.19 is in full payment of all license fees under our contract with you terminating December 31, 1940." The letter then referred to the contracts between the parties, and with reference to the last two contracts stated: " * * * we agreed to pay you a certain per cent of our income for a total of one hundred months. We have remitted to you one hundred checks covering the per cent of income so contracted received in the months of September, 1932, to December, 1940, both inclusive." The exhibit containing these letters of remittances of payment by the society admits of no other conclusion but that all of the amounts as provided for by the contracts between the parties were paid by the society in accordance therewith. From an examination of the record, this is likewise true of the contracts held by Malec, as assignee.

The manager and president of the society from 1932 to January, 1943, testified in substance that the society used the music of ASCAP until November, 1940, but paid in com-

pliance with the contract as heretofore set out; that the reason the society used ASCAP music from 1937 to 1941 was to avoid infringement suits, and it became necessary for the society to change its course of procedure in order to avoid paying 10 per cent of its net returns from the radio station instead of 5 per cent thereof, feeling ASCAP would raise the percentage figure that the society would have to pay. He also testified that he was familiar with the litigation involving the Nebraska act, its course and its termination.

Malec testified in substance that he was familiar with the same litigation, and that during 1937 and until 1941 he paid ASCAP certain sums of money in compliance with contracts, through its agent; that due to difficulties between Warner Brothers and ASCAP, Warner Brothers requested him also to obtain a license from them as well as ASCAP. He took the matter up with the ASCAP local agent and from his conversation with him determined that ASCAP could charge any amount it desired, because, under the circumstances, it would not reduce its license fee, so he refused payment. This resulted in an infringement action against him. He further testified that the ASCAP agent sent letters to those who had been investigated by its music detectives and it believed were rendering music of ASCAP for public performance for profit without first obtaining a license. These letters quoted the copyright law, the measure of damages thereunder, federal decisions, and excerpts from infringement cases. The record discloses a list of a number of infringement cases in the federal courts in this state for the years of 1928 to 1936, inclusive, and from 1942 including January, 1944. The record discloses no infringement suits in the years 1937 to 1942 inclusive. This evidence was offered for the purpose of showing the methods of ASCAP in forcing users of music for public performance for profit, controlled by it, by compelling such users to procure a license or be sued for infringement; that this method prevailed before the Nebraska act became effective May 17, 1937, and was one of the reasons that prompted the act.

The society and Malec, as assignee, contend that by reason of litigation involving the act as previously set forth, and the fact that ASCAP employs music investigators to enable it to enforce the taking out of licenses by use of the threat of infringement suits, there was no other alternative than to make the payments in compliance with the contracts.

It is apparent that the appellants were apprehensive of litigation, fearing that if they failed to comply with the contracts they would be faced with infringement suits and an eventual increase in future license fees. They therefore contend that the course of procedure adopted by ASCAP resulted in business compulsion and coercion, and, as a result thereof, the appellants are entitled to recover back the money paid pursuant to the contracts.

The appellants cite a number of infringement cases for the purpose of showing that under circumstances such as where orchestra leaders agreed to refrain from playing music of the kind involved, and prominent placards were posted stating the objections to the playing of such music, and that by inadvertence music controlled by ASCAP was played, or that a party did not intend to infringe, constitutes no defense to such an action, and *Buck v. Newsreel, Inc.*, 25 F. Supp. 787, states: "Defendants charged with infringement of copyrighted musical compositions could not interpose defense that plaintiffs were an illegal combination in restraint of trade in violation of the Sherman Anti-Trust Act."

In view of such cases, the appellants argue when the Nebraska act was nullified and an injunction issued against its operation by a federal court which also had jurisdiction in infringement suits in this jurisdiction, if the appellants, with knowledge of the lack of defense in infringement cases, failed to comply with the terms of the contract, ASCAP could, if it desired, destroy their business investment. Therefore, the payments were made to keep the appellants free from liability from defenseless infringement actions.

The appellants also cite a number of cases where undue

advantage is taken by the payee of the payer's situation and where payments are made to avoid injury to business and under apprehension of legal proceedings involving hardship or oppression, and that payments made under such circumstances are not classified as voluntary, but are involuntary payments.

We deem it unnecessary to analyze the distinction between the cases cited on the foregoing propositions and the cases at bar. It is obvious that most of the cases cited by appellants on voluntary and involuntary payment are to the effect that the complaining party was required to meet an affirmative demand of the opposing party or be compelled to quit business. There is no such testimony in the instant case. The evidence is to the contrary.

The theory advanced by the appellants is that ASCAP, as a monopoly, controlled a great part of the popular copyrighted music, and that such music was necessary to the progress of appellants' business, otherwise the business would endure hardship and oppression detrimental to its existence. It is true, ASCAP controlled a large part of the popular copyrighted music and has shown considerable growth in its membership. However, its music was not indispensable—other organizations licensed music for public performance for profit, and there was, and is, music in the public domain not controlled by any organization, available for use. The fact is that the society, when its contract with ASCAP was completed, did obtain copyrighted music from other sources. The record is bare of evidence that the appellants would suffer hardship or oppression in business, or even that their business would be detrimentally affected, in the event they did not play the music controlled by ASCAP.

Appellants also contend that the defense of voluntary payment is inapplicable as to these cases, because based on statutory liability created with the cause of action defined and granted in the statute. Under the statute ASCAP had no right to do business in this state. Appellants, by the statute, were permitted to ignore public performance rights when vested in an unlawful combination such as ASCAP.

If the appellants so believed the statute protected them, then they should have availed themselves of that protection in the courts and refused to pay any further sums under the contracts.

We believe the law announced in the following authorities governs in the cases at bar.

In *Kunkel Auto Supply Co. v. Leech,* 139 Neb. 516, 298 N. W. 150, this court said:

"The mere apprehension of legal proceedings, unaccompanied by any act of hardship or oppression allegedly causing a person to enter into a contract, is not sufficient ground for avoiding the contract so made.

"Where the parties are on equal terms, one threatened with civil suit must make his defense to the merits in the first instance." See, also, *Weber v. Kirkendall,* 44 Neb. 766, 63 N. W. 35; *Karschner v. Latimer,* 108 Neb. 32, 187 N. W. 83.

"Where one has voluntarily, with full knowledge of the facts, paid a disputed demand, which he claimed he did not owe, he cannot ordinarily recover it back on the ground of its invalidity." *Meyer v. Rosenblatt & Son,* 119 Neb. 471, 229 N. W. 771. See, also, *Renfrew v. Willis,* 33 Neb. 98, 49 N. W. 1095.

"A threat to do what one has a legal right to do cannot constitute duress. Such as * * * a threat of * * * a lawsuit * * *." 13 C. J., sec. 314, p. 399. See 55 C. J., sec. 1060, p. 1079; 66 C. J., sec. 177, p. 630; 17 C. J. S. 530, sec. 172.

In *Weber v. Kirkendall, supra,* this court said: "But one threatened with civil process, unaccompanied by any act of hardship or oppression, is required to make his defense in the first instance to the merits of the claim, and cannot postpone litigation by paying the demand and afterward maintain an action therefor."

"The reason of the rule that money voluntarily paid with full knowledge of the facts can never be recovered and its propriety are quite obvious when applied to a case of payment on a mere demand of money unaccompanied with any power or authority to enforce such demand, except by suit

at law. In such case, if the party would resist an unjust demand, he must do so at the threshold. The parties treat with each other on equal terms, and if litigation is intended by the one of whom the money is demanded, it should precede payment. When the person making the payment can only be reached by a proceeding at law, he is bound to make his defense in the first instance, and he cannot postpone the litigation by paying the demand in silence and afterward suing to recover the amount paid." 21 R. C. L., sec. 166, p. 143.

In the event the Nebraska act was unconstitutional in its entirety, or the part thereof invalidating existing contracts and denying access to the courts for enforcement thereof were void, then ASCAP had a right to resort to legal proceedings in infringement suits when the music under its control was performed publicly for profit without payment for license fees. In the event the act was valid in its provisions striking down existing contracts, the society and Malec, as assignee, had nothing to fear from an infringement suit, and should have met the issue thus presented at the threshold. See *Weber v. Kirkendall, supra; Kunkel Auto Supply Co. v. Leech, supra.*

" * * * where one under a mistake of law, or in ignorance of law, but with full knowledge of all the facts, and in the absence of fraud or improper conduct upon the part of the payee, voluntarily and without compulsion pays money on a demand not legally enforceable against him, he cannot recover it back; * * * . Where the rule stated obtains, no difference is ordinarily recognized, so far as concerns the right to recover voluntary payment, between ignorance and mistake of law." 48 C. J., sec. 312, p. 755. See *Baker v. City of Fairbury,* 33 Neb. 674, 50 N. W. 950; 40 Am. Jur., sec. 186, p. 843; 40 Am. Jur., sec. 205, p. 856; 21 R. C. L., sec. 202, p. 171.

We conclude that the appellants possessed full knowledge of all the facts and the parties were on an equal footing; that the payments made in compliance with the contracts were voluntarily made.

For the reasons given in this opinion, the judgment of the district court is affirmed.

Several questions are raised with reference to the constitutionality of the Nebraska act, sections 59-1302 to 59-1320, inclusive, R. S. 1943, repealed by the 1945 session of the legislature. In view of our holding, these questions need not be determined.

AFFIRMED.