CARPENTER PAPER COMPANY, A CORPORATION, APPELLANT, v. KEARNEY HUB PUBLISHING COMPANY, AN UNINCORPORATED COMPANY OR PARTNERSHIP, APPELLEE.

78 N. W. 2d 80

Filed July 13, 1956.   No. 33987.

*Wells, Martin, Lane, Baird & Pedersen,* for appellant.

*Barlow Nye* and *DeWayne Wolf,* for appellee.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

WENKE, J.

Carpenter Paper Company, a corporation, brought this action in the district court for Buffalo County against the Kearney Hub Publishing Company, a partnership. The action is for the purpose of recovering $4,096.71, which plaintiff alleges is due it for a carload of newsprint which it sold and delivered to the defendant on March 2, 1954. Defendant acknowledges receiving the carload of newsprint and makes no objection to the quantity or quality thereof, however, it does claim the amount sought to be recovered is incorrect, alleging the correct amount of the purchase price to be $3,927.30.

Defendant filed a counter-claim for $5,461.20 based on the claim that between January 1, 1948, and July 1, 1952, the partnership had been overcharged $5 a ton on carload lots of newsprint, and, from July 1, 1952, up to and including the last carload shipped on March 2, 1954, $6 a ton. The basis for this counter-claim is the contention that defendant's 1942 mill brokerage contract with the plaintiff fixed the mill price as the cost of newsprint sold to it by the plaintiff, defendant claiming a November 1947 agreement for cancellation thereof to have been without force or effect because of duress or

business compulsion which induced it to enter into such agreement.

Jury was waived and trial was had to the court. The trial court entered a judgment dismissing plaintiff's petition. It found for the defendant on its counter-claim and rendered judgment thereon in the sum of $1,364.50, that amount being the difference between what it found the purchase price of the carload of newsprint to be and the amount it found defendant was entitled to recover on its counter-claim. Plaintiff filed a motion for a new trial and, from the overruling thereof, has perfected this appeal.

When a jury is waived and a law action tried to the court, findings of fact have the same effect as findings of a jury. Tullis v. Blixt, 136 Neb. 142, 285 N. W. 307; In re Estate of Wotke, 133 Neb. 739, 277 N. W. 45; Vohland v. Barron, 126 Neb. 50, 252 N. W. 470. We consider the record accordingly.

Appellant is, and was at all times herein material, engaged in selling and distributing paper, including newsprint. Appellee, a co-partnership consisting of Ormand P. Hill and others, is, and was at all times herein material, engaged in publishing the Kearney Hub, a daily newspaper.

The evidence shows there are three ways in which newsprint is commonly sold: First, direct by the mill to the publisher or consumer. We shall refer to such as mill contracts and the price therein established as the mill price. Second, by mill brokerage contracts, which we will refer to by that name. While such contracts are made in the name of the distributor, the distributor is only acting for the mill. Under a mill brokerage contract the mill pays the distributor a brokerage fee for the handling. The price in such contracts is the mill price. Third, where the distributor buys the newsprint from the mill and resells it. In such contracts the distributor may charge whatever price he wishes as the mill is not a party to such contract with the consumer.

On May 18, 1942, the appellant entered into a mill brokerage contract with the Kearney Hub Publishing Company, a corporation, to supply its entire requirements for newsprint subject to an estimated annual quota of 125 tons. Its duration was for one year, May 1, 1942, to April 30, 1943, but to continue from year to year until canceled by either party.

Subsequent to this contract the Kearney Hub Publishing Company was dissolved and the question is raised, was the contract ever assigned to appellee and did appellant ever consent to the substitution? The partnership was organized by agreement dated June 30, 1943; the members were the same as the stockholders in the corporation; the partnership agreement provided the partnership was to take over and acquire title to all of the corporation assets which the stockholders would, on dissolution, be entitled to; the contract was an asset of the corporation; and appellant, until November 1947, continued to sell appellee newsprint at the mill price as in such contract provided. We find there is evidence which can be said to establish that the contract was acquired by the appellee and that appellant, by its conduct, consented to appellee being substituted therein for the corporation.

Ormand P. Hill, president of the Kearney Hub Publishing Company, later an original partner of the appellee partnership and the publisher and general manager of the Kearney Hub, testified that G. E. Carpenter, vice-president of appellant, told him, as an inducement to his agreeing to enter into the contract of May 18, 1942, and leave their then source of supply, Minnesota & Ontario Paper Company, that "Come hell or high water the Kearney Hub will be taken care of on paper." The parties are of course bound by their written agreement which they entered into and such sales talk is not a part thereof. The counter-claim is not an action to set aside the agreement of 1942, but rather an action based thereon.

Appellant's sole source of newsprint was from the mills of Abitibi Sales Company, Limited, whom we shall hereinafter refer to as Abitibi. Up until 1946 it had been handling newsprint for Abitibi solely on the basis of mill brokerage contracts, receiving $1.50 a ton brokerage for doing so. However, beginning in 1946, appellant sought to change this basis because it felt the brokerage fee, considering the increased cost of doing business, was an inadequate return for its services. In 1947 appellant succeeded in this endeavor and Abitibi agreed to sell it its allotment of newsprint except that Abitibi took over all of appellant's customers using 250 tons a year or more on a direct mill contract basis. This included the newspapers at Fremont and Hastings. As a consequence of this change of business policy between appellant and Abitibi appellant proceeded to and did cancel all of its mill brokerage contracts and entered into direct sale agreements for newsprint between itself and its customers. In doing so it added, commencing January 1, 1948, $5 a ton to what is referred to as the mill price. It thus had a gross margin of $6.50 a ton as it was able to buy the newsprint from Abitibi at $1.50 less than mill price, that being the reduction on the mill price which Abitibi allowed appellant on all of its direct purchases. This gross margin was later, as of July 1, 1952, increased to $7.50 when appellant raised the price $6 above the mill price. These prices were as low or even lower than prices generally quoted for newsprint in the area during this period of time and were not out of line with prices being charged by other distributors or jobbers.

Ormand P. Hill, one of the partners of appellee, and to whom we have already referred, went to Omaha in November of 1947 to see appellant about a possibility of getting some additional newsprint above its quota. It should be said here that appellant placed all of its customers on a quota, the amount of which depended upon the needs of the individual customer and the total

newsprint allotted to appellant by Abitibi. There Hill met and talked with Wyman D. Clark who was then appellant's merchandise and sales manager in the Omaha office which serviced Kearney. Clark advised Hill of this change in policy on the part of appellant and that beginning with January 1, 1948, it would sell appellee newsprint only on a direct basis and the price would be $5 a ton above mill price, explaining why appellant felt it was necessary to do so.

Appellant, at this time, was not under legal obligation, by reason of its 1942 mill brokerage contract, to continue to supply appellee with newsprint at mill price regardless of whether or not doing so was profitable. It could change the basis on which it was willing to sell.

Hill agreed to go along with this new arrangement although he testified he told Clark that he was doing so only because he had no other choice since he had to have newsprint. He also told Clark that he would, at the first opportunity, get a direct mill contract. The evidence shows he continuously, from then on, tried to do so, and finally did succeed in obtaining such a mill contract in 1952. He also, whenever possible, bought newsprint from other sources but such purchases were very limited.

"While executory and before a breach, the terms of a written contract may be changed by a subsequent parol agreement; and such subsequent agreement requires no new consideration." Bowman v. Wright, 65 Neb. 661, 91 N. W. 580. See, also, Personal Finance Co. v. Hynes, 130 Neb. 547, 265 N. W. 541; Swanson v. Madsen, 145 Neb. 815, 18 N. W. 2d 217.

Appellee apparently contends the mill brokerage contract of 1942 was never actually canceled because appellant did not pursue the method therein provided, which is: "* * * this contract shall continue from year to year * * * until cancelled by either party by notice in writing by registered mail on or before January 1st of any year to take effect the following April 30th."

This is of course a unilateral method for that purpose but does not in any way prevent the parties from mutually agreeing to do so, which is the situation here.

We come then to the principal question involved, that is, was the raise in price of $5 a ton, effective January 1, 1948, and the subsequent raise to $6 a ton, effective July 1, 1952, of such a character and made under such conditions that agreeing thereto can be said to be voidable because done under duress or business compulsion? We think the making of a contract may be done under such circumstances of business necessity or compulsion as will render the same involuntary and entitle the party so coerced to recover back any money paid thereunder or excuse him from performing the contract. See, Fitzgerald v. Fitzgerald & Mallory Construction Co., 44 Neb. 463, 62 N. W. 899; Nelson v. Nelson, 99 Neb. 456, 156 N. W. 1036. The same would be true of an agreement obtained to cancel an existing contract and to enter into a new one. First Nat. Bank of David City v. Sargeant, 65 Neb. 594, 91 N. W. 595, 59 L. R. A. 296.

As stated in First Nat. Bank of David City v. Sargeant, *supra:* "The rule is that when such pressure or constraint is brought to bear as will compel a man to go against his will, and takes away his free agency, destroying the power of refusing to comply with the unjust demand of another, this will constitute legal duress, regardless of manifestations or apprehension of physical force."

We think the rule is well stated in Newland v. Child, 73 Idaho 530, 254 P. 2d 1066, as follows: "* * * appellants contend that the lien agreement was obtained by the state by duress, specifically 'business compulsion,' and for that reason is unenforceable. * * * To be voidable because of duress, an agreement must not only be obtained by means of the pressure brought to bear, but the agreemeent itself must be unjust, unconscionable, or illegal. The essence of duress is the surrender to unlawful or unconscionable demands. It cannot be pred-

icated upon demands which are lawful, or the threat to do that which the demanding party has a legal right to do."

The evidence shows that newsprint was in extremely short supply all through the years following World War II until in 1953 when the market therefor seems to have eased up; that as far as appellee was concerned the appellant was its only practical source of supply as it could not have obtained another contract, since it had, from 1942 on, bought practically all of its newsprint from appellant; that the black market furnished no dependable source of supply and what was available thereon was generally of poor quality and sold at prohibitive prices; and that a daily newspaper without a regular adequate source of supply of newsprint would soon have to cease. In fact, the evidence shows that in 1947 and up until 1953 appellant had a monopoly on newsprint insofar as appellee being able to get an adequate supply thereof was concerned.

In this respect we mention briefly that appellee refers to the fact that appellant would not release its tonnage to Abitibi so it could enter into a mill contract with Abitibi. Of course appellant was under no legal obligation to do so and, in fact, appellee could not have gotten such a contract from Abitibi even if appellant had released the amount of appellee's annual tonnage from its allotment from Abitibi because it was against the policy of the latter to do so.

The evidence also shows that appellant always divided its allotment from Abitibi to its customers who used newsprint on a fair basis and this was true as to appellee. Appellant did not at any time refuse to sell appellee newsprint nor threaten to cut down its quota. It only sought to handle it on a more profitable basis. This it had a perfect right to do if, in doing so, it did not make unjust demands upon appellee in view of all the circumstances then existing.

The mill price of newsprint under appellee's mill

brokerage contract had reached $100 a ton by January 1, 1948, and gradually continued to rise until it had reached $131 a ton by March 2, 1954. To this appellant added $5 a ton until July 1, 1952, and $6 a ton thereafter. These increases in price resulted in an over-all raise in the cost of newsprint to appellee of almost 4.6 percent. We do not find such a raise to be unjust, considering the increased cost of doing business which occurred during these years, and certainly not a factual situation which would permit the appellee, on the grounds of business compulsion, to avoid the effect of its agreement with appellant entered into in November of 1947.

In its amended answer appellee alleges that in January 1954 appellant had reduced its price $6 a ton for like paper to its users of over 100 tons a year in carload lots and therefore the market price of the carload shipped on March 2, 1954, was $3,927.30 and not $4,096.71 as appellant claims.

The evidence discloses that in 1953 newsprint became more plentiful on the market so Abitibi, to meet competition, requested appellant to give all of its customers using 100 tons or more a year of newsprint a mill brokerage contract. This request appellant agreed to comply with and in December of 1953 and January of 1954 entered into such contracts with the publishers of newspapers at Columbus, Alliance, Falls City, Nebraska City, and Beatrice. It also, on January 3, 1954, offered such a contract to appellee. Due to the fact that appellee had signed a mill contract with Wright Paper Company in 1952, effective in 1954, it refused such offer. Consequently appellee was not in a position to demand that appellant charge it the mill price of $131 a ton for the carload it purchased on March 2, 1954, but rather, was still on the basis of buying direct from appellant, and it was perfectly proper for appellant to charge the $137 a ton which it did.

There are other questions raised by appellant such as the claim that the trial court improperly made a set-off

of a claim arising in tort against one arising on contract; that the counter-claim, if valid, is barred by the statute of limitations; and that no action for damages was alleged or proved. We do not pass on any of these questions as we find it neither necessary nor desirable to do so in view of our holdings hereinbefore set forth.

In view of what we have said we find no factual basis to support appellee's counter-claim and the trial court was clearly wrong in entering judgment thereon. We also find no factual basis to support appellee's defense as to the amount due on the carload of newsprint which it purchased on March 2, 1954. We therefore reverse the judgment of the trial court so holding and remand this cause with directions that it dismiss appellee's counter-claim with prejudice and enter a judgment for the appellant in the sum of $4,096.71 with interest at 6 percent from March 2, 1954.

REVERSED AND REMANDED WITH DIRECTIONS.