W. G. McCUBBIN, APPELLANT, v. HAROLD H. BUSS ET AL., APPELLEES.

144 N. W. 2d 175

Filed July 22, 1966. No. 36124.

Ellick, Spire & Ryan, for appellant.

Eisenstatt, Lay, Higgins & Miller and Daniel B. Kinnamon, for appellees.

Heard before CARTER, SPENCER, BOSLAUGH, BROWER, SMITH, and McCOWN, JJ., and KUNS, District Judge.

SMITH, J.

Plaintiff sued for rescission of an agreement which allegedly had been induced by business coercion. On this appeal from an adverse judgment he contends that the evidence establishes business coercion and that he effectively exercised his power to avoid the transaction.

The parties to the agreement, which discharged a prior stock-purchase contract, included defendant Goodrich Dairy, Inc., a close corporation, and its stockholders who were parties to the prior contract. Those stockholders may be conveniently limited to defendant Harold H. Buss and plaintiff, the evidence permitting us to arrange the holdings of the Buss family as a single interest. In the operation of Dairy, Buss was the president and plaintiff was the general manager. These relation-

ships are important in the evidence.

Dairy, which was a wholesaler and retailer of dairy products, employed plaintiff as general manager in 1948 under a written contract for a 10-year period. He served in that position until 1964 without any other express agreement concerning the duration of his employment. His annual salary rose from $9,365 in 1949 to $32,500 in 1960. There was no increase during the years 1961 to 1964 because of a ceiling set by the Internal Revenue Service.

Expansion of the business under the management of Buss and plaintiff is shown by the following data for the indicated fiscal years ending August 31:

| Year | Total Capital | Gross Sales | Gross Profit on Sales | Profit before Taxes | Net Profit |
|---|---|---|---|---|---|
| 1947-48 | $ 149,215 | $ 556,731 | $189,603 | $ 21,595 | $ 16,561 |
| 1955-56 | 541,407 | 1,152,360 | 483,151 | 78,778 | 43,313 |
| 1962-63 | 959,347 | 2,013,183 | 969,824 | 221,913 | 107,835 |
| 1963-64 | 1,032,327 | 2,012,432 | 951,930 | 191,661 | 105,981 |

The controversy may have grown out of changes in the proportionate ownership of shares of stock in Dairy. In 1948 Buss gave up his majority interest when plaintiff purchased 500 shares from Dairy; of the other 700 shares issued and outstanding, Buss owned 600 and O. B. Wasson, 100. Those interests continued to January 1, 1963, without change.

The stock-purchase contract, dated January 20, 1959, contained provisions affecting transfers prior to death as well as after death. A transfer in the lifetime of a stockholder was subject to a first option in favor of Dairy and to a second option in favor of the other stockholders. The parties agreed that Dairy would purchase the shares of a deceased stockholder, and they fixed the price of the Buss shares at book value plus 5 percent and the price of the other shares at book value. Dairy possessed an option to pay 20 percent of the price shortly after death and the balance in equal annual installments over a 10-year period, the plan being unfunded. Upon

the death of Buss or plaintiff the survivor would possess a power to terminate the contract upon notification within 60 days after the death.

A change in the proportionate interests of the stockholders occurred January 1, 1963. Dairy retired the 100 shares owned by Wasson. At the same time Buss and plaintiff each sold five shares, which were removed from the operation of the stock-purchase contract. Buss became the majority stockholder.

On several occasions in 1964 the stock-purchase contract was a topic of conversation between Buss and plaintiff. In February Buss broached a desire to discharge the contract by agreement for the reason that performance would place Dairy in a dangerous financial position. Plaintiff was noncommittal. In March they disagreed mildly, but on April 6 they exchanged heated words. The following morning Buss threatened to terminate the employment of plaintiff because of the deadlock. Plaintiff expressed surprise and also said, " 'Since you do feel that strongly * * *, I will sign the cancellation.' " The testimony is clear that he yielded his rights in order to retain his employment; Buss admitted that plaintiff probably would not have assented without the threat. On April 8 the parties signed the agreement for discharge.

On May 28, 1964, Buss orally dismissed plaintiff, the dismissal was to be effective May 30, and plaintiff was to receive severance pay equal to his salary for one month. A formal dismissal appears in the corporate records.

The doctrine of business coercion is directed at some inequalities of bargaining power. A wrongful threat to the means of livelihood of a person renders a transaction with him voidable if: (1) The threat is intended or reasonably should be expected to operate as an inducement; (2) the threat oppresses him in that he would not enter into the transaction except for the improper alternative; and (3) the threat induces him to enter into the transaction. See, Fitzgerald v. Fitzgerald &

Mallory Constr. Co., 44 Neb. 463, 62 N. W. 899; First Nat. Bank of David City v. Sargeant, 65 Neb. 594, 91 N. W. 595, 59 L. R. A. 296; Restatement, Contracts, § 492, Comment b, p. 939, § 493, p. 942.

If a person threatens to do what he has a legal right to do, his threat ordinarily does not constitute business coercion. This rule has been stated in a form which arguably implies that no threat is wrongful unless there would be an independent liability for the threatened act. See, Carpenter Paper Co. v. Kearney Hub Pub. Co., 163 Neb. 145, 78 N. W. 2d 80; Malec v. ASCAP, 146 Neb. 358, 19 N. W. 2d 540; Kunkel Auto Supply Co. v. Leech, 139 Neb. 516, 298 N. W. 150. If the implication was made, the rule was overstated. An unjust and inequitable threat is wrongful, although the threatened act would not be a violation of duty in the sense of an independent actionable wrong in the law of crimes, torts, or contracts. See, Silsbee v. Webber, 171 Mass. 378, 50 N. E. 555; Restatement, Contracts, § 492, Comment g, p. 941.

Was the threat by Buss wrongful? Since the plaintiff contends only that it was unjust and inequitable, we do not reach possible issues concerning an employment agreement terminable at will or terminating on a definite date, the partnership status of a close corporation, or a tortious interference with business relations.

In April 1964, Buss bargained from strength, and the consideration for the discharge of the stock-purchase contract was inadequate. He had become the majority stockholder during the period of time between the dates of the two instruments. The value of the stock-purchase contract to plaintiff was greater in April 1964, than it had been when no one owned a majority of the shares, whereas the value to Buss was less.

The single motive for the threat is not disguised by the contention that Dairy would be heavily burdened in performing the stock-purchase contract. Dairy was financially stronger in 1964 than it had been in 1959. Its statement of financial condition on August 31, 1964,

contains the following data: Total assets, $1,237,419; total current assets, $405,960; cash and United States Treasury bills, $281,712; total liabilities, $205,092. There were conflicting opinions whether it would be practicable for Dairy to make the downpayment and installment payments, but we find it improbable that Dairy would meet difficulty in borrowing money for those purposes. The contract itself would probably protect Dairy. Should plaintiff die first, Buss would be able to terminate the contract. Should Buss die first, payment for his shares would be secured by the contract.

Cause for dismissal was a prominent issue in the trial, the parties apparently considering it a part of the issues concerning the wrongfulness of the threat as well as the existence of pressure. Buss criticized the performance by plaintiff on the grounds of absenteeism and other neglect of duty, but the evidence shows no material breach by plaintiff of his employment contract. Buss had kept those complaints to himself prior to dismissal, and he admitted that plaintiff had performed consistently over the years.

Buss held plaintiff responsible for the decline in sales and profits from 1962-63 to 1963-64. The cause was speculative and the remedy doubtful. Indeed Buss and his accountant projected the decline into the future for the purpose of showing a heavy financial burden on Dairy if performance were to be called for; yet plaintiff would not be a managerial agent during the projected period of time.

Buss denied that on April 8 he had intended to discharge plaintiff or to train Dwight Buss, a son 25 years of age, for the position of general manager. In July Dwight began working for Dairy on a daily basis.

We conclude that the evidence of business coercion is clear and convincing. The business relations among the parties, the impropriety of the sole motive for the threat, the wrongful pressure on the collateral interest of plaintiff in his employment, the causation between

threat and agreement, and the inadequacy of the consideration add up to a voidable transaction.

Defendants' argument that plaintiff's conduct constituted a waiver, estoppel, or affirmance which precludes rescission, stems from several events which occurred subsequent to May 28, 1964, the date when Buss had orally dismissed plaintiff. A few days after his dismissal plaintiff consulted his attorneys. On July 24, 1964, he commenced an action to recover from Dairy on his claim for salary to the end of the 1963-64 fiscal year, but he made no reference to the agreement for discharge of the stock-purchase contract. On September 22, 1964, he first demanded that defendants reinstate the contract.

"The power of avoidance * * * is lost if * * * the injured party unreasonably delays manifesting to the other party his intention to avoid the transaction.

"* * * the following circumstances are influential:

"(a) the speculative character of the contract whereby prolongation of the power to affirm or to avoid would give an advantage to the injured party or increase the loss * * * (to) the other party;

"(b) the likelihood that the (culpable) party * * * will materially change his position, or the welfare of a third person be unjustly prejudiced by delay;

"(c) the fact that change of position by the (culpable) party * * *, or prejudice to a third person, has in fact occurred during a period of delay in manifestation of intention." Restatement, Contracts, § 483, p. 921. See, also, Glatfelter v. Curtis, 130 Neb. 628, 266 N. W. 63; Russo v. Williams, 160 Neb. 564, 71 N. W. 2d 131; Restatement, Contracts, § 499, p. 957.

Although nothing hindered plaintiff from avoiding the agreement long before September 22, the delay was not unreasonable. His inaction offered slight prospect of gain or loss to either party, and no material change of position or prejudice occurred.

A party who possesses a power of avoidance for business coercion loses it by electing to affirm the trans-

action. See Restatement, Contracts, § 484, p. 924, § 499, p. 957. Commencement of plaintiff's action for salary was no such election. The duration of his employment agreement depended on facts remote from the agreed discharge of the stock-purchase contract. The threat by Buss did not imply an offer by Dairy to retain plaintiff as general manager for a reasonable length of time, and plaintiff followed a consistent course in his action for salary.

The agreement for discharge of the stock-purchase contract was voidable for business coercion, and plaintiff exercised his power of avoidance with reasonable promptness. The judgment is reversed and the cause remanded with directions to rescind the agreement for discharge and to reinstate the stock-purchase contract.

REVERSED AND REMANDED WITH DIRECTIONS.

KUNS, District Judge, dissenting.