GILBERT KOBATAKE, INC., and KUWAYE BROTHERS, INC., Plaintiffs-Appellants, *v.* KAISER HAWAII-KAI DEVELOPMENT CO. and KAISER-AETNA, a California general partnership, Defendants-Appellees

NO. 5390

SEPTEMBER 30, 1974

RICHARDSON, C.J., KOBAYASHI, OGATA AND MENOR, JJ., AND CIRCUIT JUDGE KATO IN PLACE OF LEVINSON, J., RECUSED

OPINION OF THE COURT BY KOBAYASHI, J.

Gilbert Kobatake, Inc., and Kuwaye Brothers, Inc., appellants or contractors, appeal to this court from a summary

judgment granted Kaiser Hawaii-Kai Development Company, appellee or owner, by the trial court.

We reverse.

Both appellants and appellee agree that the trial court held, as a matter of law, that a document entitled Change Order No. 2, dated June 22, 1967, executed by both the appellants and appellee, resolved all issues in favor of appellee. A transcript of the proceedings below is not available on the record.

Though appellants allege several errors on appeal, for the purpose of this opinion the issue is limited to whether or not the appellee, by duress, obtained appellants' signatures to Change Order No. 2.

Appellants and appellee entered into a contract for the dredging and excavation of Kuapa Pond, Honolulu, Oahu, and the filling of certain marinas in said pond. In a document entitled Agreement, paragraph FIRST thereof states:

FIRST: The complete contract consists of the following documents; to wit: Information and Instructions to Bidders, Notice to Proceed, Proposal, Agreement, General Terms and Conditions, Standard Specifications, Special Provisions, Detailed Specifications, Plan entitled "Dredging, Grading and Borrow Site Plan" by Kaiser Hawaii-Kai Development Co., dated March 30, 1966, plus grading plans for the fill areas showing exact finish grade outlines and elevations to be prepared by Owner, providing for the performance of the following work:

INSERT 1

The scope of work will include all work necessary to excavate the designated areas of Kuapa Pond to at least the minimum design bottom elevation and to fill the designated marina areas to the required finished elevations, all in accordance with the plans and specifications and to the satisfaction of the City and County of Honolulu, Federal Housing Administration [FHA], and Kaiser Hawaii-Kai Development Co. Drawings showing scope of work entitled "Dredging, Grading and Borrow Site Plan" by Kaiser Hawaii-Kai Development Co. dated March 30,

1966, are a part of this contract. They will be supplemented at a later date by grading plans showing exact finish grade outlines and elevation for fill areas. Final pay quantities of embankment will be determined after survey and detailed plans are completed by the Owner's engineers.

The designated areas to be filled under this contract are:

> Marina Business Center No. 2
> Marina Business Center No. 1
> Marina 4 & 5, Marina 11, partial
> Marina 7-E partial.

Paragraph FOURTH thereof states:

FOURTH: The Owner promises and agrees that upon performance and fulfillment of the covenants aforesaid to pay to the Contractor for said work in the manner provided by law and in the complete contract, the sum to be determined by method outlined on Insert 2, which sum is subject, however, to increases or decreases in such proportions as may be required by change orders in writing, duly approved by the Owner, as provided in the contract.

INSERT 2

1. $1.05 Times the number of cubic yards in the total theoretical volume of fill in place between existing ground elevations and final elevations and grades as shown on the grading plans to be included at a later date as a part of this contract.

2. Volume of fill for payment, to be determined by Owner's engineer from the grading plans to be included as a part of this contract, will be subject to verification by the Contractor. It is understood that the contract price will be converted to a lump sum contract price when the volume of fill has been so determined.

3. It is further agreed that the unit price of $1.05 is based on a preliminary estimate of 850,000 cy of fill in place. For final fill quantities as determined by the Owner's engineer up to 10% above or 10% below this

estimate, the unit price of $1.05 will apply.

. . . .

The appellee issued to the appellants a written notice to proceed.

In the document entitled DETAILED SPECIFI-CATIONS, the paragraph pertinent to our opinion states:

E. FILLING OPERATION

1. SEQUENCE

The sequence of filling the area *will be a prerogative of the contractor* [appellants] (emphasis added).

Notwithstanding said prerogative of the appellants, the appellee gave a written demand to the appellants stating:

We transmit herewith two copies of a plan showing the temporary berms to be constructed for the purpose of isolating Marina 5 and 11 from the proposed filling opera-tion. As we have discussed with you, these two Marinas are to be processed through the FHA and, therefore, cannot be filled at the present time. We hope to submit our request in the very near future and will attempt to expedite the review and approval by the FHA as much as possible.

Your cooperation on this matter is much appreciated.

The appellants informed the appellee by letter that a change in the sequence of filling the marinas can be made only by the incurring of extra expenses and demanded extra payment — aside from the regular contracted for payments — of $30,960.78.

The appellee in a written reply rejected appellants' de-mand for extra payment and insisted that appellants proceed with the work. The letter in pertinent parts states:

Your proposal of isolating Marina 5 and 11 by the con-struction of berms is not acceptable to us. We feel that the work should not cost as much as $30,960 and further, that such costs should be borne by the contractor and not Hawaii-Kai. . . . The only reasonable method to obtain the concurrence of the FHA on the filling program is to secure an advanced grading report. Our latest contact with the FHA indicates a review time of approximately two months before the issuance of the advanced grading

report which is required before the placement of fill in Marina 5. This time, of course, could be lengthened depending on the work load of the FHA and on any special problems encountered in their review.

The FHA has verified the fact that this report can only be obtained by foregoing the filling of the area until their review has been completed. In any case, additional costs arising from these alternative operations would be borne by the contractor. We will make every effort to expedite the FHA's review and approval of the program.

In view of the foregoing, we feel that your suspension of dredging operations should not be connected in any way with the FHA approval of filling in Marina 5, since you have the alternative measures mentioned above to take care of the situation. You have the prerogative of halting the dredging operations if it suits your overall construction program or cash flow. It should be understood, however, that although we concur with this action, since it enables you to concentrate on the compaction work, this will not justify an extension of the contract completion date.

. . . .

On June 22, 1967, Change Order No. 2 was signed by both appellants and appellee. Paragraphs numbered 1 and 3 thereof are pertinent hereto:

## Description and Cost of Work

1. In accordance with Section A of the Detailed Specifications of the subject contract, the attached plans entitled "Marinas 4, 5, 11 and Marina Business Center 1, Grading Plan for Land Building, Revision No. 1 dated June 15, 1967" and "Lunalilo Peninsula Marina 7E, Grading Plan for Land Building, Revision No. 1 dated June 15, 1967", both prepared by Park Engineering, Inc., shall be a part of this contract.

. . . .

3. In accordance with Insert 2, paragraph 1, 2 and 3 of the Proposal section of the subject contract, the lump sum compensation for this contract is $895,293

(Eight Hundred Ninety-Five Thousand Two Hundred Ninety-Three and No/100 Dollars), based on $1.05 times the final fill quantity of 852,660 cubic yards.

The appellants contend that appellee obtained appellants' signatures to Change Order No. 2 by duress or coercion. Appellee, however, argues that appellants' claim of "duress" or "coercion" is "based solely upon the financial burdens and business considerations under which appellants were functioning at the time Change Order No. 2 was executed".

The totality of the record reflects the following salient points on the issue before this court:

1. The appellants had the sole prerogative of determining the sequence of filling all of the marinas, except Marina 7-E.

2. The appellee had no legal right to demand that appellants fill Marinas 5 and 11 out of appellants' planned sequence at their own expense.

3. The contract did not call for immediate inspection or preliminary approval by FHA prior to the final fill of the marinas.

4. Appellee's letter demanding a change in the sequence of filling the marinas and its letter of refusal to pay the extra costs for such change both indicate quite clearly that the appellee had the onus of obtaining any necessary FHA approval that may have been required relative to the fill or filling of the marinas. (Furthermore, in oral arguments, counsel for appellee acknowledged that appellee had the responsibility of obtaining the said FHA approval.)

5. Among the contractual documents, the DETAILED SPECIFICATIONS in paragraph entitled "H. Testing and Acceptance" states:

The *final fill* shall meet the grading requirements of City and County of Honolulu and the FHA at the date of completion of fill. The acceptability of the fill will be determined by the soils engineer and the appropriate government agencies. The filled land is to be acceptable for building within 3 months after it is filled (emphasis added).

Contractor will be responsible for lay out and moving of

effluent pipes, cat tracking or other means to obtain this condition. The acceptability of the area for building will be determined by the soils engineer. It will also be the responsibility of the soils engineer as a representative of Kaiser Hawaii-Kai Development Co. to approve the method of hydraulic fill proposed by the Contractor. Dredging specifications will be adhered to, except where alternate proposals by the Contractor are approved for use. Final survey of finished elevations will be done by the owner when requested by the Contractor.

6. Insert 1 of INFORMATION AND INSTRUCTIONS TO BIDDERS requires that the scope of work must be in accordance with plans and specifications and to the satisfaction of FHA and others.

7. The record does not address itself specifically to the need of preliminary FHA approval of plans and specifications of scope of work, including the preliminary filling of the marinas, before appellee's issuance to appellants of the notice to proceed with the work. A preliminary FHA approval is not reflected in the record.

8. Notice to Proceed was issued by appellee to appellants and thereafter appellee demanded that appellants change their planned sequence of filling the marinas — premised on appellee's inability to obtain necessary FHA approval.

9. Raymond Ortiz (of Mid-Pacific Contracting Company, sub-contractor of appellants for the excavation and dredging of Kuapa Pond and the filling of the marinas) stated in his deposition:

> I was unable to continue financing it. The Hawaii Kai people were unreasonable in their progress payments, and I just couldn't carry the job.
>
> . . . .
>
> . . . [W]e had been given the prerogative of selecting a sequence at the beginning, and at that time we had programmed the entire project the way we were going to do it. . . . That is the only way you can do this work economically, and you have to follow a sequence.
>
> You have all this pipeline and equipment following you. To make a change in position of the dredge means

taking up all this equipment and getting reset up again.
. . .

> . . . [W]e were really geared to operate and continue going in here, and when they told us to stop here, we couldn't put material in here, this hadn't been mentioned to us before.
>
> . . . .

We are, therefore, of the opinion that appellee's demand that appellants change their planned sequence of filling the marinas at their own expense was unjust and unlawful. The inequity and injustice of appellee's unlawful demand was further compounded by appellee's own failure to obtain the allegedly necessary FHA approval on time. The totality of the record shows that appellants not only had to contend with their financial burdens and business considerations, but had to surrender to the pressure of appellee's unconscionable and unlawful demand. We are, therefore, of the opinion that appellee by duress obtained appellants' signatures to Change Order No. 2. Thus, Change Order No. 2 is invalid and of no legal effect. *Scutti v. State Road Department,* 220 So.2d 628, 630 (Fla. 1969); *McCubbin v. Buss,* 180 Neb. 624, 144 N.W.2d 175 (1966); *Newland v. Child,* 73 Ida. 530, 254 P.2d 1066 (1953). *See also Sheraton Hawaii Corporation v. Poston,* 51 Haw. 142, 146, 454 P.2d 369, 372 (1969).

We are of the further opinion that, as a matter of law, the conduct of the appellants from the date of execution of Change Order No. 2 to the date of the institution of the proceeding herein, as reflected in the record, does not constitute a ratification and affirmance of the legal effect of Change Order No. 2 by the appellants. *Furman v. Gulf Insurance Company of Dallas,* 152 F.2d 891, 894-95 (8th Cir. 1946). We are aware of the several cases holding contra to our opinion. *Smith v. Jones,* 76 Misc.2d 656, 351 N.Y.S.2d 802 (1973); *Diffenderfer v. Heublein, Inc.,* 412 F.2d 184 (8th Cir. 1969); *Lewis v. Kerns,* 175 F. Supp. 115 (S.D. Ind. 1959). However, we believe our conclusion is just.

We remand for further proceedings consistent with this opinion.

*Kazuhisa Abe (Abe* and *Abe* of counsel) and *Shuichi Miya-*

*saki (Okumura* and *Takushi* of counsel) for plaintiffs-appellants.

*Frank D. Padgett (Padgett, Greeley* and *Marumoto* of counsel) for defendant-appellee.

PAUL ELKINS and ALLEN W. BARR, ON BEHALF OF THEMSELVES AND ALL OTHER VOTERS OF THE COUNTY OF MAUI, STATE OF HAWAII, Plaintiffs, *v.* GEORGE R. ARIYOSHI, as LIEUTENANT GOVERNOR and CHIEF ELECTION OFFICER OF THE STATE OF HAWAII, and THE OFFICE OF THE LIEUTENANT GOVERNOR OF HAWAII, and JAMES S. USHIJIMA, as COUNTY CLERK OF THE COUNTY OF MAUI, and the OFFICE OF THE COUNTY CLERK, COUNTY OF MAUI, STATE OF HAWAII, Defendants

NO. 5773

OCTOBER 21, 1974

RICHARDSON, C.J., KOBAYASHI, OGATA and MENOR, JJ., and CIRCUIT JUDGE HAYASHI ASSIGNED BY REASON OF VACANCY

*Per Curiam.* Paul Elkins, the Republican nominee for the office of Mayor of the County of Maui, and Allen W. Barr, campaign coordinator for Mr. Elkins, brought this original action in the Supreme Court of Hawaii on behalf of themselves and all other voters of Maui County, wherein they petitioned this court to declare the results of the October 5, 1974 primary election as it affected Maui County to be null and void and to order a new primary election.

48

The defendants moved to dismiss the complaint on the grounds, that the plaintiffs lacked standing to contest the primary election held in the County of Maui, and that the complaint failed to state a claim against the defendants upon which relief could be granted.

At the outset of the summary hearing conducted on October 16, 1974, we ruled that Mr. Barr was not a proper party to the proceedings and did not have the requisite standing under HRS § 11-172. We nevertheless gave him leave to speak in behalf of Mr. Elkins, in order that this court might be fully apprised of all the facts surrounding this controversy.[1]

The complaint in this action was filed with this court in a timely manner,[2] setting forth "reasons for reversing, correcting, or changing the decisions of the precinct officials." These reasons included such alleged irregularities and election law violations as a disproportionate number of personnel drawn from the same political party; an inadequate number of official observers; the misuse of duplicated ballots; the failure to distribute School Board ballots in two precincts; the failure to properly instruct precinct officials; campaigning within 1000 feet of polling places; and the denial of certain voting rights with regard to the Lanai councilmanic election. More generally, the plaintiffs during oral argument decried the "room for abuse" and the "possibilities of fraud" which they maintained such a poorly run and inadequately supervised election process generated.

HRS § 11-172 provides as follows:

With respect to any election, any candidate, or qualified political party directly interested, or any thirty voters of any election district, may file a complaint in the supreme court. The complaint shall set forth any cause or causes, such as but not limited to, provable fraud, over-

[1] We need not reach the question of whether a successful primary candidate has standing to contest the election results where such action would not alter his position vis-a-vis the other candidates, inasmuch as the matter before us can be dispatched on alternate grounds. We also leave unresolved the questions of whether a successful primary candidate may challenge the validity of his opponent's election, or may examine his own vote count via this special proceeding.

[2] "[N]ot later than 4:30 p.m. on the sixth day after a primary . . . ." HRS § 11-173.5(a), as amended by Act 34, S.L.H. 1974.

ages, or underages, *that could cause a difference in the election results*. The complaint shall also set forth any reasons for reversing, correcting, or changing the decisions of the precinct officials or the officials at a counting center for electronic ballots. (Emphasis added).

We read the words "difference in the election results" in the statute to mean a difference sufficient to overturn the nomination of any particular candidate or candidates in the primary. Neither in the complaint nor in oral argument have the plaintiffs shown that the specific acts and conduct of which they complain would have had the effect of changing the results of the primary election conducted in the County of Maui on October 5, 1974. We hold, therefore, that the complaint is legally insufficient and that it fails to state a claim against the defendants upon which relief can be granted.

The statute provides that this court shall decide "what candidate was nominated or elected, as the case may be, in the manner presented by the petition, and a certified copy of the judgment shall forthwith be served on the chief election officer or the county clerk, as the case may be, who shall place the name of the candidate declared to be nominated on the ballot for the forthcoming general or special general election." HRS § 11-173.5(b). In an instance where a primary election result is disputed, it is incumbent upon this court, in an extraordinary summary proceeding, to determine which of a number of candidates is the one nominated for the purpose of the primary election.[3] Where there is only one nominee from a particular party, and no cause exists for invalidating the election process as in the present case, there is nothing for this court to decide. *Cf. Akizaki v. Fong*, 51 Haw. 354, 461 P.2d 221 (1969).

This is not tantamount to saying that the plaintiffs are without a remedy if they can prove the alleged irregularities outlined in the complaint. HRS Chapter 19, especially HRS §§ 19-3 and 19-6, contains a panoply of criminal charges that

*Paul Elkins,* pro se *Allen W. Barr,* pro se, Plaintiffs.

*M. Gay Conklin,* Deputy Attorney General *(George Pai,* Attorney General, of counsel) for Defendants.